Report of Referee.

HEARD NOVEMBER TERM, 1877.

CASE No. 611.

MARY A. HUGHEY v. WILLIAM H. EICHELBERGER, EFFIE,.
W. EICHELBERGER, HIS WIFE, JOB L. HUGHEY, ET AL.

1. Under the proviso to Section 415 of the code of procedure, a witness in;
interest is not incompetent to testify to communications and transactions.
had between a person deceased and some third person. *Roe* v. *Harrison*,.
9 *S. C.* 279.
2. The rule that the decision of the court below upon a question of fact is.
conclusive, except where there is no evidence to sustain it, or it is mani-
festly against the weight of the evidence, does not apply where such.
decision overrules the findings of a referee and is reached by a considera-
tion of testimony taken in writing. *Dewitt* v. *Atkinson*, 6 *S. C.* 140, and
*Gee* v. *Hicks*, *Rich. Eq.* 5, approved.
3. Where land was conveyed by a father for the benefit of his daughter, by
a deed purely voluntary, which reserved to grantor the right to use,.
occupy and enjoy the land, and even to revoke the gift, and the grantor
did take possession of such land four years thereafter and kept it, and
received all the rents and profits for fourteen years, and then died intes-
tate, such land is an advancement to the daughter, but only as of the date
of her father's death, to be estimated at its then value, according to its.
condition at that time.
4. But the father's estate is not liable to the daughter for the rents and
profits of those fourteen years.
5. Slaves given to a child cannot, under our statute, be accounted an
advancement in cases where the parent died after the abolition of slavery.
6. The question whether the services of such slaves while in the child's
possession would constitute an advancement, suggested but not decided.
7. A payment of money by a father to his daughter, *held*, from the evidence,
not to have been a gift.

Before NORTHROP, J., Newberry, October, 1876.

By order of the Court of Common Pleas for Newberry county,
all issues in this cause were referred to Thomas Thomson, Esq.,
whose report fully states all the facts of the case. It is as
follows:

Daniel Hughey, late of the county of Newberry, died intes-
tate on September 22d, 1868. His heirs-at-law and distributees
are his widow, (the plaintiff,) who was his second wife, his daugh-

ter, Effie W. Eichelberger, wife of William A. Eichelberger, of Winston county, State of Mississippi, and Job L. Hughey, a son of the plaintiff and a minor. Effie W. Eichelberger is a child by intestate's marriage with Mrs. Ruff, who was a widow.

On the 15th day of October, A. D. 1868, administration of the personal estate of the intestate was granted by the judge of the Court of Probate to the plaintiff. It is affirmed, or conceded by all parties, that the personal estate is ample for payment of debts.

William H. Eichelberger and Effie, his wife, who have for many years resided in the State of Mississippi, came, soon after intestate's death, to this state. On the 3d day of November, A. D. 1868, they filed a petition in the Court of Probate of New-berry county, praying partition of the lands of Daniel Hughey, deceased, and also of such personalty as could be divided—mak-ing as parties to the proceeding Mary A. Hughey and Job L. Hughey, alleged to be a minor about fourteen years of age.

Mary A. Hughey, on the 14th day of the same month, (November,) filed her answer in the Court of Probate and assented generally to the statements of the petition, but stated that the intestate in his lifetime had made considerable advance-ments in money, to wit, the sum of $3000, in A. D. 1854, to Effie W. Eichelberger, and also, to the best recollection of the defendant, (Mary A. Hughey,) five slaves. It was suggested in her answer, as a mode to equalize the shares between Job L. Hughey and Effie W. Eichelberger, that the alleged advancements should be a charge upon the land to be allotted to the latter.

Job L. Hughey, by Thomas M. Lake, his guardian *ad litem,* filed his answer the same day, (November 14th,) assenting to partition, but setting forth fully the alleged advancements to his sister, Effie W., and claiming they should constitute a charge on his sister's part of the real estate. Under these proceedings, John T. Peterson, Esq., judge of the Court of Probate, issued a writ for the partition of the lands. On the 7th day of Decem-ber, A. D. 1868, the commissioners made return of the writ, dividing both tracts of land into several parcels, recommending a partition (but not compulsory) between the parties, or a sale. On the subject of advancements the commissioners were silent.

This return, it seems, was never confirmed.

William H. Eichelberger and Effie W., his wife, say they objected to the partition of the Sligh tract on the day the commissioners came on the land.

Mary A. Hughey, in the bill subsequently filed by her, alleges that William H. Eichelberger and wife obtained leave to amend their petition by alleging that four hundred and one and a half acres of the tract of land lying in Newberry county belonged to the separate estate of the said Effie W., by a deed made by Daniel Hughey, in his lifetime, to William J. Alston, as trustee; and that because of said amendment the judge of the court declined to entertain jurisdiction in the premises.

After the lapse of about one year, Mary A. Hughey, in turn, became a plaintiff, filed her bill in the court of equity for partition, on the 15th day of December, A. D. 1869, and, in addition to the heirs-at-law of her deceased husband, made David Murphy, John Murphy and Cuffy Tom Alston parties to the proceeding. Besides the questions in the pleadings in the Court of Probate, and restated in her bill, she charged that the title of Effie W. Eichelberger to the four hundred and one and a half acres of land was pretensive and unfounded, should be investigated and set aside by the court, and prayed partition.

William H. Eichelberger and wife filed their answer on the 4th day of March, A. D. 1870. They claimed the tract of four hundred and one and a half acres as being held in trust for Effie W. Eichelberger under a deed of which they alleged the consideration to be her interest in a part of the land described in the bill, which had belonged to her mother when she was married to the intestate.

On April 23d, 1872, Job L. Hughey, by his guardian *ad litem,* James F. Glenn, filed his answer, restating briefly his rights as heretofore set forth.

When the bill was filed, the interests of David Murphy, and of others, under leases or agreements, were existing and may have stood in the way of complete partition.

These rights, whether valid or otherwise, have ended by their own terms, and are no hindrance now. The referee regards the adjustment of these interests as matters between the plaintiff and

the parties having had the use and occupation of the land, or for account under this proceeding when full information can be given of the state of such accounts.

The first subject which presents itself for consideration is the deed from Daniel Hughey to William J. Alston, trustee, and, if valid, its effect upon the rights of the parties.

On Friday morning, April 26th, 1872, it was agreed—Messrs. Baxter, Fair, Pope and Jones being present—that the deed of trust from Daniel Hughey to William J. Alston, trustee, and three deeds executed in Mississippi, viz., one from James Liddell and Francis Liddell, his wife, to P. A. Eichelberger, trustee for Effie W. Eichelberger, and two deeds from Joab Liddell and Anna Liddell, his wife, to P. A. Eichelberger, trustee for Effie W. Eichelberger, should be regarded proved, as to their formal execution, without further proof. The referee did not understand the agreement to embrace the constitution or effect of the deeds. This mutual concession, not of rights, but of form, renders unnecessary the consideration of some technicalities connected with these papers.

William H. Eichelberger was the owner of lands in Newberry county, known as the Lyles (and Heller) tract, (or tracts) for which he paid, as he states, the sum of $5050. He was the owner of this land before his marriage with his wife, Effie W., and also at the time of his marriage. It appears he was in debt, and the land was sold by the sheriff and purchased by George Eichelberger, who wished to purchase it cheaply, with intent to befriend William H. Eichelberger. Under some arrangement William H. Eichelberger held an occupancy or use of this land for life. Daniel Hughey wished to purchase the land, and through the agency of W. H. Eichelberger became the owner of the whole estate, wife's dower excepted. According to Mr. Hope's testimony this transaction was at the instance of Mr. Hughey, and occurred about A. D. 1847 or 1848.

From the Lyles land W. H. Eichelberger and wife moved at the instance of D. Hughey to lands in Fairfield, known as the Thornton land. Effie W. Eichelberger testifies the land was once owned by her mother. William H. Eichelberger made improvements on the Thornton land whilst it was in his pos-

session to the value of $500. This possession must have been brief, for again, according to the testimony of Mr. Hope, W. H. Eichelberger and wife, at the instance of Daniel Hughey, moved from the Fairfield land to the Sligh tract, in Newberry county.

At some period of time, not distant from their removal to the Sligh land, Daniel Hughey made the deed of trust to William J. Alston for the benefit of Effie W. Eichelberger and her issue surviving. The deed bears date the 5th day of February, A. D. 1850, and was recorded in the secretary of state's office the 3d day of May, A. D. 1850.

After this deed was made, houses were built and other improvements made upon the Sligh land of the value of $1500. W. H. Eichelberger testifies the improvements were by the labor of the slaves of his wife, Effie, and through her means.

Another removal awaited William H. Eichelberger and his wife, which was from the Sligh land to Winston county, State of Mississippi. This removal was commenced from Newberry county about the beginning of November, A. D. 1854, and terminated in Mississippi about the 11th day of December of same year.

The trust deed by its terms retains the land in the power of the grantor. He reserved the land, or so much as he pleased, for his own use. If he sold, the trustee was to convey according to his sale and reinsert as he directed. He retained power to revoke the deed by his own deed or will. He gave Effie W. Eichelberger a life interest. He could permit her to remain on the Sligh land for such time as he wished and again resume possession of it. During his lifetime Daniel Hughey could, by an exercise of his reserved power, have destroyed the interest of his daughter. Even when menaced by a letter from Mississippi claiming the land he forbore to exercise his power, strengthening the statement of P. A. Eichelberger at the parting in A. D. 1854, that Effie would get the land after his death.

The referee is of opinion that the deed contained a gift of the land *in presenti*, to be enjoyed *in presenti*, unless the grantor changed the possession and use by the exercise of his reserved power; and when the use was so *changed again* to take effect, unless destroyed by the exercise of the reserved power.

The referee is of opinion that the trust deed took effect according to its terms and is a valid paper. The referee can find no distinct act of Effie W. Eichelberger intended to relinquish or destroy her interest under the trust deed. And much doubt might be entertained whether any act of hers (until of late) could have had such effect.

The next question relates to the advancements in money alleged to have been made to Effie W. Eichelberger.

There can be no doubt when E. W. Eichelberger left the state she received a considerable sum of money from her father—about $3000. Was this money a gift or advancement, or was it a payment?

The transactions between D. Hughey and William H. Eichelberger and wife, for some time before and to the time of their parting in A. D. 1854, wore a business air. Six or seven weeks before W. H. Eichelberger left, the witness, Clark, heard D. Hughey offer W. H. Eichelberger $1000 for the remainder of the crop, stock, &c., that would be on the farm. Without attempting to state an account, the excess, if any, in the amount received by Effie W. Eichelberger appears small when balanced with counter claim. Her claim in her mother's property, her claim of dower relinquishment, the improvements on the Sligh· land surrendered to her father, improvements on the Thornton land, beside the sale by her husband, might well be regarded as, between parent and child, a fair equivalent for the $3000. Some of the claims were expressly included in such settlement as the parties made ; and if all were not, (though there is no testimony otherwise) circumstances would suggest to the parties that another adjustment could not soon be made.

The referee does not regard the claim of D. Hughey as resting on a pecuniary consideration. Apart from the difficulty of a grantee repudiating a part of a deed under which claim is made and proving a different consideration from that expressed, the evidence is not satisfactory that D. Hughey intended to execute the trust deed in satisfaction of Effie W. Eichelberger's interest in her mother's land. There may have been promises by D. Hughey and expectations on his daughter's part, but the promises were vague, and the trust deed, upon its face, is evidence that no

thinking person would have relinquished a pecuniary right for its uncertain provisions.

The referee is of opinion that all the rights and claims of Effie W. Eichelberger and her husband were paid by the sum of $3000, except that contingent right in the Sligh land, depending for its existence upon the good will of D. Hughey.

The form of certain deeds in Mississippi by persons there to W. H. Eichelberger, in trust for Effie W. Eichelberger, was urged to show that the Mississippi lands were a substitute for her interest in the Sligh land. Considering the sources from which the money was derived which went in payment of the Mississippi lands, the character of a trust might well be attached to it. Besides, it is not to be overlooked that experience may have taught the propriety of securing her interest in the form of trust.

The deed of trust mentions five negro slaves, Bill Gwin, Emeline, her infant child, Sam Bull, Nance and Judy. The description of them in the deed corresponds with that given by Effie W. Eichelberger in her testimony. She says: " David Hughey gave the witness five negro slaves, one man and woman, two girls and a child."

The possession by Effie W. Eichelberger of these slaves was never disturbed by D. Hughey. They went with her to Mississippi; and there was good reason to record the trust deed there, that strangers might have notice of the title to the property.

The referee is of opinion that these slaves were an advancement, and should be accounted for.

He deems any attempt at stating the accounts premature. He has not the information, and the accounting may greatly depend upon the view taken by the court of the matters he will ask leave to report.

The referee submits as his " finding of facts :"

*First.* That Daniel Hughey died intestate on the 22d day of September, A. D. 1868, in the county of Newberry.

*Second.* That he left, as his heirs-at-law and distributees, his widow, Mary A. Hughey, and children, Effie W. Eichelberger and Job L. Hughey.

*Third.* That administration of his personal estate was granted to Mary A. Hughey.

*Fourth.* That the personal estate in the hands of the administratix is ample for payment of debts.

*Fifth.* That the intestate died seized and possessed of real estate in the counties of Newberry and Fairfield, described in the pleadings, which are subject to partition.

*Sixth.* That Daniel Hughey, on the 5th day of February, A. D. 1850, executed a deed of trust to William J. Alston of a parcel of land known as the Sligh land, in Newberry county, and five slaves—one man, one woman and three children.

*Seventh.* That W. H. Eichelberger lived with his family on the Sligh land from A. D. 1850, until November, 1854.

*Eighth.* That improvements worth about $1500 were made upon the Sligh land during said time.

*Ninth.* That Daniel Hughey had possession of the Sligh land from (about) November, 1854, to the time of his death in A. D. 1868.

*Tenth.* That Effie W. Eichelberger held the slaves mentioned in the deed of trust as her own property, from A. D. 1850 until they were emancipated.

*Eleventh.* That Effie W. Eichelberger had claims upon her father and rights which were relinquished to him, and also that William H. Eichelberger had claims for personalty sold, which were settled by the payment of $3000 by Daniel Hughey.

*Twelfth.* That the land and slaves described in the trust deed to William J. Alston were not included in the above settlement.

The referee finds as " conclusions of law :"

*First.* That the trust deed of Daniel Hughey to William J. Alston is valid.

*Second.* That during the time Effie W. Eichelberger was in the use and occupation of the Sligh land, she is not to account for profits or pay rent.

*Third.* That from November, 1854, to the death of Daniel Hughey in A. D. 1868, his estate is not to account for use and occupation.

*Fourth.* That the estate of Daniel Hughey is to account for use and occupation of the Sligh land to Effie W. Eichelberger from the death of Daniel Hughey.

*Fifth.* That the Sligh land is to be regarded and held as an

advancement to Effie W. Eichelberger, taking full effect as such at the death of Daniel Hughey.

*Sixth.* That Effie W. Eichelberger, in accounting for this land as an advancement, must take it with all improvements as it was left by intestate at his death, and accounting for its value at such time.

*Seventh.* That the former slaves in the trust deed were an advancement to Effie W. Eichelberger, and she is to account for their value as it was when the deed was made in A. D. 1850, according to the common rules of advancements.

*Eighth.* That the sum of $3000, paid by Daniel Hughey to Effie W. Eichelberger, is not to be accounted for by her.

*Ninth.* That a writ issue for the partition of the lands of which Daniel Hughey died seized and possessed, excluding the Sligh land, but that the return of the commissioners await confirmation by the court until an accounting, including both real and personal estate, can be had.

A reference was held at Newberry, September 13th, 1872, and testimony taken, the object of which was to show a use by the administratrix of funds of the estate either for personal purposes or for profit. The referee is of opinion that at this time the matter should be embraced in the accounting, and he reports the testimony taken by him without comment or expression of opinion.

To this report all parties excepted, and case came up for hearing in Circuit Court on such exceptions.

The decree of the Circuit judge, is as follows :

It is adjudged and decreed that the first exception put in on the part of the plaintiff, Mary A. Hughey, and the defendant, Job L. Hughey, be so far sustained as to charge Effie W. Eichelberger as an advancement with $2000 of this money ($3000), handed to her by her father as she was leaving for Mississippi in December, 1854, with interest from the death of her father, Daniel Hughey, and that all of the other exceptions be overruled.

It is further adjudged and decreed that the first, second and third exceptions filed on the part of W. H. Eichelberger and Effie W., his wife, be sustained, and that the deed from Daniel

Hughey to W. J. Alston, trustee, dated the 5th day of February, 1850, is a valid subsisting deed, vesting the property therein described according to the use and trust therein expressed in Effie W. Eichelberger for and during her natural life, and at her death to go to the remaindermen, according to the terms and limitations of said deed, and that said land be delivered up to the said Effie W. Eichelberger, and that the estate of Daniel Hughey account to her for the rents and profits of the same from the first of January, 1855.

It is further adjudged and decreed that the property, real and personal, described in said trust deed is not to be accounted for as an advancement by the said Effie W. Eichelberger.

It is further adjudged and decreed that the fourth, fifth and sixth exceptions put in on the part of W. H. Eichelberger and Effie W., his wife, be overruled, and that the said report, as modified by the decree, be confirmed and made the judgment of the court.

#### APPELLANTS' GROUNDS OF APPEAL.

Mary A. Hughey and Job L. Hughey appeal from the decree of the Court of Common Pleas in this action on the following grounds, to wit:

*First.* Because the Circuit judge erred in deciding that the Sligh land and five slaves were conveyed to the defendant, Effie W. Eichelberger, in payment of debts or other contracts of the intestate, Daniel Hughey, to or with her, inasmuch as the deed of conveyance and the only competent evidence in the case show the conveyance to have been purely gratuitous on the part of the grantor.

*Second.* Because the Circuit judge erred in holding that the estate of Daniel Hughey shall account for the use of the said Sligh land from November, 1854, inasmuch as, by the very terms of the deed, he had the authority to use the said land or to cause it to be sold at any time during his lifetime, and inasmuch as there is no evidence showing that his control and authority over the land was ever modified by subsequent action on his part or with his consent.

*Third.* Because the Circuit judge erred in holding that the

sum of $1000 out of the sum of $3000 furnished by Daniel Hughey to the said Effie W. Eichelberger was a payment of a debt to her, (the said Effie W.,) inasmuch as there is no proof of his owing her any sum of money for any cause.

*Fourth.* Because the Circuit judge should have decided that the $3000 and the five slaves were advancements to the said Effie W. by the said Daniel Hughey, to be accounted for by her, with interest, from his death.

*Fifth.* Because the Circuit judge should have decided that the Sligh land was a mere loan to the said Effie W., resumed by her father with her consent on her removal to Mississippi.

*Sixth.* Because the Circuit judge should have excluded all the depositions of Effie W. and her husband as incompetent, in that they are the testimony of parties opposed in interest to the intestate and in regard to his declarations and transactions.

*Seventh.* Because, if the said sum of $3000 was not a pure gratuity from Daniel Hughey to the said Effie W., the circumstances show that it must have been paid her in settlement of all her claims in the Sligh land.

*Eighth.* Because, if the estate of Daniel Hughey is to account for the use of the Sligh land, it should be only from his death in 1868.

Eichelberger and wife also appealed upon the following grounds:

1. Because his Honor erred in deciding that Effie W. Eichelberger should account for, as an advancement, $2000 of the $3000 of the money handed to her by her father, D. Hughey, as she was leaving for Mississippi, with interest from the death of D. Hughey.

2. Because his Honor erred in deciding that Effie W. Eichelberger should account for the value of the Sligh place at the death of D. Hughey, including in said valuation the $1500 worth of improvements put upon it by her, as an advancement, whereas in another part of his decree he has held that the Sligh land and five slaves named in the trust deed were not an advancement. This error was evidently unintentional.

3. Because his Honor erred in deciding that Effie W. Eichel-

berger had possession of all five of the slaves named in the deed to W. J. Alston, from the date of the deed up to the time they were emancipated, when the evidence is that she only had possession of four of said slaves.

4. Because his Honor erred in deciding that Effie W. Eichelberger had released her right to her distributive share in her mother's real estate, except in part payment of the Sligh tract and five negroes named in the deed of trust.

L. J. JONES,

*Attorney for Eichelberger and wife.*

*Messrs. Baxter, Pope, Suber* and *Caldwell*, for Mrs. Hughey and J. L. Hughey.

*Messrs. L. J. Jones* and *Leroy F. Youmans,* for W. H. Eichelberger and wife.

July 31st, 1878.   The opinion of the court was delivered by

McIVER, A. J.   Daniel Hughey died intestate on the 22d of September, 1868, leaving as his heirs-at-law and distributees his widow, the plaintiff, and two children, the defendant, Job L. Hughey, the child of plaintiff, and the defendant, Effie, a child of a former marriage, and now the wife of the defendant, William H. Eichelberger.   The intestate, at one time, owned three tracts of land in the county of Newberry, one known as the Sligh place, called sometimes the Kinard place, and the Lyles and Heller tracts.   After the marriage of Eichelberger to the said Effie, they lived for a time on the Lyles and Heller lands, which then belonged to him.   Subsequently, however, they were sold by the sheriff for his debts and bid in by his brother, George A. Eichelberger, but W. H. Eichelberger, under some arrangement with his brother, "held an occupancy or use of this land for life," and so continued in possession until sometime in 1847 or 1848, when Daniel Hughey purchased these two tracts, and William H. Eichelberger and wife removed to the Thornton land, in Fairfield county, upon which they made improvements to the value of some $500.   This Thornton place was said to have been the property of Mrs. Eichelberger's mother, but the

testimony on this point was not very distinct, and it did not appear what was the value of the place nor the extent of Mrs. Eichelberger's interest therein; though it would seem from the testimony of Hope that there were other heirs of her mother besides Effie and her father, whose interests had been bought up by Daniel Hughey, who seemed to have the use and control of the place. After remaining a short time on the Thornton place, William H. Eichelberger and wife again removed to the Sligh place, but at what particular time is not stated. These several moves upon the part of the Eichelbergers seem to have been made at the instance of the intestate, Daniel Hughey.

Soon after their removal to the Sligh place, Daniel Hughey executed a deed, bearing date the 5th of February, 1850, to William J. Alston, for the Sligh place and five slaves, to be held by him in trust for the sole and separate use of the said Effie during her life, ("subject to the exception or reservation hereinafter made") and after her death to be settled upon her issue; and in case of her death without leaving issue, then the said land and slaves were to become the absolute property of said Daniel Hughey. The exception or reservation is that the said Daniel Hughey retains the right—*First.* "To have, use, cultivate and enjoy, in the most ample manner, free from any rent, claim or hindrance whatever, so much of said tract of land as the said Daniel Hughey may think proper." *Second.* The right to require the trustee to sell all or any part of the property mentioned in the deed, and reinvest the proceeds in lands or slaves, as said Daniel Hughey may direct. And, *Third.* The right, by deed or will, to revoke or annul this deed, or make such other disposition of the said property as he may see fit. Daniel Hughey died without exercising the power of revocation or alteration, and the Circuit judge, adopting in this respect the finding of the referee, held this deed to be valid and sufficient to convey the property therein mentioned upon the trusts therein declared, and from this part of his decision there is no appeal.

Some time in the latter part of the year 1854, W. H. Eichelberger and wife left the Sligh place, after having made improvements thereon to the value of about $1500, and removed to the State of Mississippi, where they still reside. Immediately after

they left, Daniel Hughey took possession of the Sligh place and continued in the use and occupation of it up to the time of his death—a period of nearly fourteen years; but the slaves mentioned in the deed continued in the possession of Mrs. Eichelberger until they were emancipated.

While on their way to Mississippi, Mrs. Eichelberger received from her father a sum of money amounting to about $3000, but whether as a gift, or in payment of claims which she and her husband may have had against her father is one of the questions in the case.

The questions raised by this appeal are—*First.* Whether the Sligh place was an advancement—and if so, when was it made and how is it to be valued? *Second.* Whether the five slaves mentioned in the deed of trust can be regarded as advancements. *Third.* Whether the money received by Mrs. Eichelberger from her father was an advancement. *Fourth.* Whether the estate of Daniel Hughey must account for the use and occupation of the Sligh place, from the time he took possession, say January 1st, 1855, or only from the time of his death. There is also a question of evidence which it will be necessary to dispose of, viz., whether the testimony of Eichelberger and wife, as to transactions or communications with the intestate, was competent. The objection to so much of the testimony of Eichelberger and wife as relates to transactions or communications had with the intestate, must be sustained under the express terms of Section 415 of the code of procedure, so far as the testimony of Mrs. Eichelberger is concerned; but so far as the testimony of William H. Eichelberger is concerned, it cannot be sustained. The transactions and communications referred to were between the intestate and Mrs. Eichelberger, and not between the intestate and W. H. Eichelberger. The language of the code, Section 415, is: "That no party to the action * * * * shall be examined *in regard to any transaction or communication between such witness and a person at the time of such examination deceased,*" &c., and as held by this court in the recent case of *Roe* v. *Harrison, MS.;* decision filed March 9th, 1878. The proviso to Section 415 of the code does not apply when the transaction or communication

D

was not between the witness and the deceased, but between the deceased and some other person.

The question whether the Sligh place is to be regarded as an advancement, is mainly a question of fact, in the solution of which the referee and the Circuit judge have reached different conclusions. We agree with the referee in the conclusion which he has adopted. He heard and saw the witnesses when they testified, and therefore had a better opportunity of judging of the force and effect of their testimony than the Circuit judge, who, as is said in the case, "did not hear the evidence in the cause," by which, we must presume, is meant that he did not hear the witnesses testify; for we certainly would not be at liberty to presume that a judge would undertake to decide a case depending largely upon issues of fact, without hearing the testimony read, which had been taken by the referee, and most assuredly we could not assume that any judge would undertake to overrule the decision of a referee upon a question of fact, without first ascertaining what the testimony was, upon which such decision was based. Therefore, while the rule is to accept the decision of the court below upon a question of fact, as conclusive, except where it is, either without any evidence to sustain it, or is, manifestly, against the weight of the evidence; yet where such decision overrules the decision of a referee, and is reached by a consideration of testimony taken in writing, the rule does not apply. *Dewitt* v. *Atkinson*, 6 S. C. 142. As this court has, then, the same opportunities of judging of the testimony as the Circuit judge had, and, as is said in *Gee* v. *Hicks, Rich. Eq.* 20, "in such cases of difference of opinion between the Chancellor and the commissioner upon the facts, this court is bound to examine the Chancellor's decree and either adopt or reject it, as the facts may appear to warrant." In doing this, however, we are not "to enter into any discussion at large of all the evidence introduced, or to take up the testimony of every witness on the one side and compare it with that introduced on the other side to rebut it. We look at it as a whole, and justify our conclusion by the influence which its entire scope makes on our minds." *Dewitt* v. *Atkinson, supra.* Looking, then, at this question in this light, the first circumstance which attracts our attention is

that the deed conveying the Sligh place is, on its face, a purely voluntary deed, made by a father for the benefit of his married daughter; next, that the interest conveyed is subject to such reservations and conditions as to render such interest so precarious, during the life of the grantor, as to make it extremely difficult, if not impossible, to suppose that any person possessed of ordinary mental capacity, would be willing to pay any pecuniary value for it; and, finally, we are at a loss to discover any sufficient evidence to show that this deed was based upon any valuable consideration passing from the grantee or the person beneficially interested thereunder, to the grantor. Regarding this, then, as an advancement, the next inquiry is, when was it made—at the date of the deed or at the time of the death of the intestate? By the terms of the deed the interest conveyed to or for the benefit of Mrs. Eichelberger, was of so uncertain and precarious a character, dependent wholly upon the contingency of the grantor's remaining in the same mind, that it can scarcely be said that any *legal* interest passed under it, until, by the death of the grantor, without altering or revoking the deed, such contingency had happened; and when, in addition to this, it is remembered that the intestate exercised his reserved right of resuming the use and enjoyment of the land in a comparatively short time after the making of the deed, and continued in such use and enjoyment up to the time of his death—a period of nearly fourteen years—we do not think the advancement can properly be regarded as having been made until at the time of his death, when it was no longer possible for him to exercise the reserved right of revocation. It must, therefore, be estimated at its value at that time in the condition in which it then was, and we can see no ground for allowing Eichelberger and wife anything for the improvements which they put upon the place while they were in the occupation of it, especially as the value of these improvements was, doubtless, as the referee finds, included in the settlement made between Mrs. Eichelberger and her father, when she was on her way to Mississippi, as will hereinafter be more particularly noticed.

*Second.* The slaves mentioned in the deed of February 5th, 1850, cannot be regarded as an advancement; for, besides the

fact that this property cannot be regarded as having been really given to Mrs. Eichelberger until the death of the intestate, inasmuch as the donor reserved to himself not merely a life estate, but, practically, the absolute title, with the right to use and dispose of the property during his life, as completely and absolutely as if no such deed had ever been made, together with the right to revoke the deed, we do not see how a slave can be regarded as an advancement when the intestate died after the abolition of slavery, whereby slaves lost their attributes as property. It is manifestly impossible to ascertain the value of such an advancement, if advancement it be called. By our act of 1791, corresponding in its terms with *Sec. 7, ch. LXXXV., Gen. Stat., p.* 440, the value of the advancement is to be estimated "at the death of the ancestor," relation being had to its condition at the time of the gift. *McCaw* v. *Blewitt,* 2 *McC. Ch.* 104. Now, in this case, the intestate having died after the slaves were emancipated, it is clearly impossible to ascertain the value of these slaves by the rule established by the statute, and we are not at liberty to invent any other. It is not like the case of a slave dying after the gift and before the death of the intestate, while slaves continued to be property, because then we would be at no loss in applying the rule. In such a case, slaves continuing to be property, a standard of value of *such property* would still be accessible, and the question as to what would such a slave, as the one given, in the condition in which it was at the time of the gift, be worth at the time of the death of the intestate, would present no impossibilities or even difficulties, as the value could readily be measured by such existing standard. But in the case now under consideration there was no such standard at the time of the death of the intestate, inasmuch as there was then no such property. The cases of *Manning* v. *Manning,* 12 *Rich. Eq.* 410, and *McLure* v. *Steele,* 14 *Rich. Eq.* 105, do not conflict with this view, as in each of those cases the ancestor died while slaves were still property, though the settlement of the estate was not made until after the slaves were emancipated. Hence, the question presented to us did not and could not arise in those cases. Without adverting to other reasons, this we think sufficient to show that the slaves mentioned in the deed of trust cannot be regarded

as an advancement. It may be that the services or hire of these slaves, while they were allowed to remain in the possession of Mrs. Eichelberger by the intestate, might constitute an advancement, but as that question has not been raised by any exception we cannot consider it, and do not wish to be regarded as indicating any opinion with reference to it.

*Third.* The next question is as to the money—$3000—received by Mrs. Eichelberger from her father while on the way to Mississippi. This, too, is a question of fact, and upon it, likewise, the referee and the Circuit judge have reached different conclusions; the former, finding that no part of this sum of money was an advancement, but was a payment of sundry claims held by Eichelberger and wife against the intestate, while the latter holds that only $1000 of the sum was a payment, and that the balance should be charged as an advancement against Mrs. Eichelberger. Upon what grounds the Circuit judge drew this distinction do not appear, as no reasons are given by him for any of the conclusions which he has reached. Here, too, we prefer to adopt the conclusion of the referee, as better sustained by the evidence. It is very true that the testimony as to this point, especially after excluding the testimony of Mrs. Eichelberger, so far as it related to transactions or communications had by her with the intestate, is not as clear and satisfactory as is desirable; but still we are of opinion that there was sufficient evidence to warrant the conclusion reached by the referee, especially when it is remembered that this was a transaction between a father and his daughter, who was about to remove to a distant state, leaving behind her such property as it would be inconvenient to take with her, and having certain claims which she and her husband undoubtedly did have against him. It would be unreasonable to expect that parties so related, dealing with each other under such circumstances, would go into nice calculations of value, or make accurate and detailed statements of the several claims which were brought into the settlement. Hence, while the testimony may not, perhaps, be sufficient to enable us to make such statements, which the parties themselves did not, probably, undertake to make, we think there is quite sufficient in the testimony to justify the conclusion reached by the referee, that no part of the

$3000 was a gift, but that the whole sum was paid in satisfaction of the various claims which the one party had against the other. There is no doubt but that Mrs. Eichelberger had a contingent claim of dower in the Lyles and Heller lands, which was released to her father; that Eichelberger left on the Sligh place, when he removed to Mississippi, his crop, stock and other articles, which went into the possession of Daniel Hughey and which he must have estimated to be worth at least $1000, as Clark proves that he offered that much for these various articles; and that Eichelberger, under an arrangement with his brother, had a life interest in the Lyles and Heller lands, which seems to have been surrendered to Hughey. We think, too, that there is good reason to believe that the interest of Mrs. Eichelberger in the estate of her mother was likewise included in this settlement. Then, too, the improvements which the Eichelbergers had put upon the Thornton place and the Sligh place, though not, perhaps, constituting the basis for any *legal* claim against Hughey, might very well serve as a basis for a payment by Hughey to Eichelberger and wife, upon the same principle as that announced in *Merrill* v. *Merrill*, 2 *Strob. Eq.* 153, " that though a parent is entitled to the services of his children while under age, he may waive his right and may make the services of his children the consideration of a contract or promise, and that he may give property *bona fide* in the performance of such obligation of justice, without its being subject to a claim on the part of the other children to consider it in the light of an advancement."

All these various items might very well constitute a sufficient consideration for the sum of money received by Mrs. Eichelberger from her father, and therefore we agree with the referee that no part of this sum of money should be charged as an advancement to Mrs. Eichelberger.

After what had been said on the first question, it is scarcely necessary to say anything as to the fourth question, as it is very manifest that the estate of Daniel Hughey cannot be charged for the use and occupation of the Sligh place, except from the time of his death. We may add, however, that any other conclusion would be directly in face of the express terms of the

deed of trust, exempting him from such charge, during his life, while in the exercise of the right reserved to him by the deed.

The third ground of appeal submitted on behalf of Eichelberger and wife, does not seem to have been pressed on the argument and was probably abandoned, as it is certainly not sustained by any testimony whatever, so far as appears in the "case" as submitted, and is directly in face of the finding of fact by the referee and the decision of the Circuit judge. In addition to this, under the view which we have taken of this case, holding that the slaves were not to be regarded as an advancement, this ground loses its practical importance.

The fourth ground of appeal presented by the Eichelbergers is in the following words: "Because his Honor erred in deciding that Effie W. Eichelberger had released her right to her distributive share in her mother's real estate, except in part payment on the Sligh tract and five negroes named in the deed of trust." The language in which this ground of appeal is presented necessarily implies that Mrs. Eichelberger did release her interest in her mother's estate, and the only complaint is that the Circuit judge erred in holding that the consideration for such release was anything except a part payment for the Sligh tract and five negroes named in the deed of trust. We are unable to discover any such holding on the part of the Circuit judge. For as he decided that the Sligh tract and the slaves were not advancements, and as the grounds upon which such a decision was invoked were that they were not gifts, but were conveyed upon valuable consideration, a part of which was the release of Mrs. Eichelberger's interest in her mother's estate, the reasonable inference is that the Circuit judge did decide exactly what is demanded by the fourth ground of appeal, and hence, there is no foundation for any such ground. But as we think, as we have indicated above, that the release of Mrs. Eichelberger's interest in the estate of her mother, constituted a part of the consideration for which the sum of money—$3000—was paid by her father to her, it becomes unimportant to determine precisely what the Circuit judge did decide upon this point.

The judgment of the Circuit Court, in so far as it conflicts

with the views herein expressed, must be set aside, and the case remanded to the Circuit Court for further proceedings, in accordance with the principles herein established.

Decree modified.

WILLARD, C. J., and HASKELL, A. J., concurred.