Decree of Judge G. Duncan Bellinger follows:
In October 1948, the Southern Silica Mining and Manufacturing Company instituted this action for the purpose of determining the rights of the plaintiff and of the defendant under two contracts made between the plaintiff and the late F. Augustus Hoefer, on the 1st day of March, 1928, and the second on the 1st day of November, 1943, and for appropriate relief for the breach of the two contracts.
Motions to strike, to make more definite and certain and to require election were disposed of in my order of December 31, 1948. *Page 484 
Defendant's answer and counterclaim denied a breach of either contract, asked the Court to declare that she was entitled to exercise the option to renew contained in the lease agreement of November 1, 1943, and to fix renewal terms.
The reply alleged that the defendant was not entitled to the renewal because she had breached the agreement by failing to keep the leased property in repair and had abandoned portions of the leased premises.
By agreement of the parties this matter was marked heard at the November Term of the Court of Common Pleas for Lexington County and all issues of law and fact were submitted to this Court for decision. Since I am called upon to pass upon the facts as well as the law in the case the recitations of fact set out herein are my findings. In many instances there is no dispute about the facts; in other matters I have found the facts in accord with the weight of the evidence.
Prior to March 1, 1928, Southern Silica Mining and Manufacturing Company was engaged in the sand business with its principal place of business at Dixiana in Lexington County. On that date the Company and F. Augustus Hoefer entered into a written agreement which provided for the construction of a sand drying plant at a cost of $5,000.00 on the property of the plaintiff at Dixiana. The cost was contributed in equal amounts by the Southern Silica and by Mr. Hoefer.
Under the terms of this agreement Mr. Hoefer was to operate the plant and Southern Silica was to furnish the sand and the site. The net profits from the operation of the business were to be divided equally, with Southern Silica making the sales and keeping the books of account. The funds were to be withdrawn from a joint account on checks signed both by the President of Southern Silica and Mr. Hoefer. The parties were to share any losses equally.
The contract provided that in the event of the death of Mr. Hoefer the agreement should terminate and the legal *Page 485 
representative of Mr. Hoefer would sell his half interest in the sand drying plant to Southern Silica Mining and Manufacturing Company at a price to be agreed upon and upon failure to agree at a price equal to $1,000.00 more than half of the appraised value of the plant.
The sand drying business was operated in this fashion until 1938 when Southern Silica leased its sand business at Dixiana and at Summit to Mr. Hoefer, which lease included the Southern Silica's half interest in the sand drying plant. Thereafter Southern Silica received a stated rent rather than one-half of the profits under the 1928 agreement. This 1938 lease renewed on November 1, 1943 for a term of five years is the second agreement in issue here.
Meanwhile, in 1939, H.W. Hoefer, a son of F. Augustus Hoefer, became associated with his father in operating the Dixiana and Summit properties under the terms of the lease with the plaintiff. He has been with the business continuously since that time. After his father's death in November 1944, Mr. Hoefer continued in charge of the business for his mother, who was the Executrix and sole beneficiary under the terms of Mr. Hoefer's will. In all matters connected with the issues here he has represented Mrs. Hoefer.
Shortly after the death of F. Augustus Hoefer, John G. Ehrlich, the President of the Southern Silica Mining and Manufacturing Company, approached H.W. Hoefer to buy from his mother her half interest in the sand drying plant as provided in the contract of March 1, 1928. Mr. Hoefer advised him that his mother did not wish to sell at that time, preferring to wait until November 1948 when the lease expired. Mr. Ehrlich acquiesced in this request and did not press for the purchase of the half interest until 1948.
During the year 1947, the defendant's three children and her daughter-in-law opened a new sand pit at Shuler on the Southern Railway between Columbia and Savannah. They put in an industrial spur track, sand pit machinery and began *Page 486 
operations in late 1947 during which year the pit shipped twenty-six cars of sand. In 1948 the shipments aggregated some eleven hundred cars.
The defendant Sophie S. Hoefer (Mrs. F. Augustus Hoefer) owns no interest in the Shuler pit. Forty-five percent of the stock is owned by Mr. and Mrs. H.W. Hoefer, the remainder by Mrs. Hoefer's daughter and other son. Theodore Hoefer manages the Schuler plant while his brother H.W. Hoefer continues to manage the sand business of his mother under the Southern Silica lease of November 1, 1943.
In January, 1948, the defendant discontinued the operation of the sand pit at Summit which was a part of the business covered by the 1943 lease. Since that time she had shipped no sand from this plant and has not operated the sand pit machinery. It has not been maintained and together with the industrial track allowed to fall into complete disrepair.
In January, 1948, when the Summit operation was discontinued its major customer was the Southern Railroad, which for many years had purchased its sand requirements in this area from Southern Silica. After the lease of 1938 the Hoefers had supplied this contract from Summit billing the sand under the name of "Southern Silica Mining and Manufacturing Company — F. Augustus Hoefer" as provided in the 1943 lease. At that time the Hoefers transferred this business to Shuler and have supplied sand to the Southern from Shuler since that date, continuing the billing under the Southern Silica name.
In February, 1948, the defendant notified the plaintiff that she wished to exercise the option contained in the 1943 lease to renew for "an additional five years upon terms to be then (November, 1948) agreed upon between the lessor and lessee."
In June, 1948, the plaintiff notified the defendant of its desire to exercise its option to purchase the Hoefer half-interest *Page 487 
in the sand drying plant at Dixiana under the provisions of the 1928 contract. The considerable correspondence which followed showed the plaintiff's insistence on purchasing the half interest and an unwillingness on the part of Mrs. Hoefer to sell. Her interest was in securing a renewal of the lease.
On October 13, 1948, the plaintiff advised the defendant that it had just come to its attention that the defendant has failed to comply with the lease covenant to keep the equipment and machinery "in good repair and in good running order" and had abandoned the Summit properties. It therefore asked possession as of November 1, 1948, the expiration date of the lease. This the defendant refused in a letter insisting on a renewal. This action followed.
On these facts we reach the first issue in the cause which is whether the plaintiff is entitled to an order of this Court requiring the defendant to name a price for the Hoefer half interest in the sand drying plant under the following provision of the contract of March 1, 1928: "It is further agreed that in case of the death of the said F. Augustus Hoefer, this agreement shall terminate, but the operation thereof may be continued by the said Southern Silica Mining 
Manufacturing Company for its own benefit, and the legal representatives of the said F. Augustus Hoefer shall convey and release unto the said Southern Silica Mining Manufacturing Company the interest of said F. Augustus Hoefer in said sand drying plant upon payment to him or them, of a price to be agreed upon, and if a price cannot be agreed upon between said parties, then said legal representatives of F. Augustus Hoefer will sell his interest in said sand drying plant to Southern Silica Mining Manufacturing Company at a price equal to one thousand ($1,000.00) dollars more than one-half of the appraised value of the plant and good receivables at the termination of the contract; such appraisers to be appointed and to act in the manner provided in the preceding paragraphs hereof, and the decision of a *Page 488 
majority of the appraisers to be binding on the parties. The Southern Silica Mining Manufacturing Company is to have sixty (60) days after the price is agreed upon or appraisement made within which to comply."
The defendant urges that the option to purchase contained in the 1928 contract has been superseded by the 1943 agreement and either the plaintiff has lost that right altogether or it was postponed until the expiration of the lease and its renewal.
A careful examination of the two contracts shows that the contract of November 1, 1943, expressly kept alive the 1928 contract and there is nothing in either instrument to indicate that it was the intention of the parties that the execution of the lease contract would void or supersede this part of the 1928 contract. It is true, of course, that the effect of the 1943 contract was to give Southern Silica a flat rental rather than one-half of the profits as contemplated under the earlier document. That feature, however, has nothing to do with the option to purchase.
Even if the 1943 contract were construed as postponing the date of exercising the purchase option from 1944 — the date of Mr. Hoefer's death to the end of the lease period it would not avail the defendant because the lease has expired and she is not entitled to a renewal for the reasons hereinbelow.
Another and somewhat contradictory position of the defendant is that by failing to insist upon the Hoefers selling in 1944 the plaintiff waived its right to exercise its option to purchase. In support of that position they urge the language of the 1928 contract indicating that sale was to be made by the legal representatives of Mr. Hoefer and the position that an option, being unilateral in character is to be construed most strongly against the party claiming under it. Hutto v. Wiggins, 175 S.C. 202, 178 S.E. 869, 872;Jackson v. Rogers, 11 S.C. 49, 96 S.E. 692; Pope v.Goethe, 175 S.C. 394, 399, 179 S.E. 319, 99 A.L.R. 1005. *Page 489 
It is clear, however, that the failure of Southern Silica to insist on the purchase in 1944 at the time of Mr. Hoefer's death was due to the specific request of the defendant. Certainly equity does not look with favor upon the defendant's argument that by acquiescing in her request the plaintiff has lost its right to purchase.
In the correspondence between the parties it is to be noted that, while the defendant seemed to question the plaintiff's right to purchase in her letter of June 18, 1948, and though when asked specifically by the plaintiff as to whether she did question it, her letters of July 20, and September 8, seem to evade the issue, on September 21, 1948, in rejecting the plaintiff's offer, the defendant stated "that it may be well that we appoint appraisers to fix the value of the same." By referring to appraisers, as provided in the 1928 contract, she recognizes the right of the plaintiff to buy at a price to be fixed. Certainly if she had any other thought it was her duty to have answered the direct question put to her in the letter of July 7. Having asked Mrs. Hoefer to state definitely whether she was obligated to sell, the plaintiff had the right to rely upon the language of the letter of September 21 as recognizing its right to purchase.
It is my conclusion, therefore, that the agreement was in full force and effect in June, 1948, when the plaintiff requested that a price be agreed upon so that it could purchase. The parties failed to reach an agreement and the plaintiff having named an appraiser and so notified the defendant, the proper relief is to require the defendant to name an appraiser to act with the plaintiff's appraiser under the terms of the 1928 contract.
The position of the parties with reference to the lease contract of November 1, 1943, may be summarized as follows:
The plaintiff claims that the defendant has breached the contract in failing to keep the machinery and equipment "in good repair and in good running order", that the plaintiff is *Page 490 
entitled to a money judgment in an amount which would put this machinery and equipment in the condition required by the contract, that the defendant has abandoned the operation of the Summit pit and that her breach of the contract in these two particulars defeats any right which the defendant had under the option to renew.
The defendant admits that she had failed to keep the machinery and equipment in good repair and in good running order, but she argues that the remedy is for the Court to order her to put it in the condition required by the contract; she denies that she had abandoned the property, and urges that under the 1943 contract she has a right to exercise the option to renew and that the Court should fix a rental.
Even without the defendant's concession it is clear from the pictures. Exhibits D-R, taken at the Summit pit on October 9, 1948, and from the oral testimony in the record, that the machinery and equipment at the Summit pit is in complete disrepair. This includes the tracks, the switches, the engine, the steam shovel, the crossties, the buildings and the push car.
Since January 1948, when the defendant discontinued the operation of this sand pit she has done no maintenance or repair work on any of the machinery, the buildings or the equipment on the property. On the contrary the main gear of the shovel was taken to the Dixiana pit in the spring of 1948 to replace a broken gear and no effort has been made to repair or replace the broken gear. The dwelling on the property has fallen into such disrepair that the caretaker in recent weeks has moved from the property.
While the testimony presents some difficulty in arriving in the exact dollar figure which would put this machinery in the condition required by the contract, it is clear that the amount is substantial.
The Southern Railway's track supervisor testifies that to put the railroad into good running order would require an *Page 491 
expenditure of $7,728.69, which he detailed in Exhibit S. Under the contract between the railroad and Southern Silica involving the construction and maintenance of the industrial spur at Summit it was the obligation of Southern Silica to keep the industrial tracks at all times "in good condition and repair and in all respects in accordance with the reasonable requirements of the Railway Company looking to the safe and convenient operation of engines and cars over and upon the same." This obligation, of course, became the obligation of the defendant when under the 1943 contract she agreed to keep all machinery and equipment "in good repair and in good running order." There is no other reliable testimony as to what it would cost to put the rail line in repair. It is true that the defendant's witness, Harrison, testified on this point, but he went to the property for the purpose of inspecting the other machinery and made no real inspection of the rail track.
With regard to the other machinery and equipment at Summit, Thos. H. Hewitt, Equipment Engineer of the South Carolina Highway Department, fixed a minimum figure of $1,680.00 and a maximum figure of $2,970.00 to put this rail line in repair. The only other testimony on this point is the estimate of Gaines W. Harrison that it would require $704.66 to put this item in repair. An examination of Mr. Harrison's testimony convinces me, however, that his estimate does not purport to put the property in the condition required by the contract and is more in the nature of dressing it up with paint rather than putting it in good running order.
At Dixiana, Mr. Hewitt's testimony indicates a minimum of $950.00 and a maximum of $1,250.00 to put the machinery in proper running order. Mr. Harrison's figure is $354.00.
The breach of this maintenance clause also damages the plaintiff in the loss of business incident to the time necessary to put Summit in operating condition. *Page 492 
Weighing all of the testimony with reference to the amount necessary to put in repair I find and conclude that $10,350.00 is the amount which will be necessary to put this property in the condition required by the lease.
The defendant suggests that the proper remedy is for the Court to order her to put the property in condition. To do so, however, would be for the Court to direct an unwilling party to repair machinery belonging to another party, an order which it is difficult for the Court to police or enforce. The evidence here enables me to find the amount which will be necessary to put the machinery in condition and the appropriate remedy, therefore, is to award judgment in favor of the plaintiff for this amount.
On the issue of abandonment the language of the lease is: "And It is Further Expressly Understood and Agreed between said parties that in case said lessee, his heirs, executors, administrators or assigns, shall abandon said premises, or any part thereof, or at any time be three months in arrears in payment of rent, the lessor, its successors or assigns, may at its option, without notice, and either in its own name or as agent of the lessee, relet said premises, or any part thereof, on such terms and for such rent as it may deem to be expedient and proper, or may repossess and take possession of the premises and property hereby leased and such reletting or retaking shall not operate as a waiver of any right which the said lessor would otherwise have to hold said lessee responsible for the rent above reserved.
Counsel for both parties rely upon Witt v. Poole,182 S.C. 110, 115, 188 S.E. 496, as stating the applicable rule on abandonment pertinent here.
The applicable rule is very clearly stated in 1 C.J.S., Abandonment, Section 4b, where it is said: "An intention to abandon property or a right need not appear by express declaration, although it may be manifested thereby, but is ordinarily to be ascertained from the acts and conduct of *Page 493 
the owner or holder. It may be inferred as a fact from the surrounding circumstances, and is shown by acts and conduct clearly inconsistent with any intention to retain and continue the use or ownership of the property or right. So, in determining whether property or a right was intended to be abandoned, it is proper to consider, and to give due weight to the nature of the property or right, and the conduct of the owner in relation to it, and also the fact, where it is a fact, that at the time in question comes up for determination such property or right is being adversely used by another, or others. Lapse of time, and nonuser, are likewise circumstances to be taken into consideration, even though neither of them is, in itself, an element or act of abandonment."
While the testimony discloses no declaration on the part of Michael A. Witt expressive of an intention to abandon his easement, we think the evidence conclusively shows abandonment by his acts and conduct, and may be inferred as a fact, not only from the surrounding circumstances, but is shown by his conduct, clearly inconsistent with any intention to retain his rights.
In some cases as in Witt v. Poole, the evidence is so strong as to justify a Court in directing a verdict of abandonment. In other cases the issue is for the jury. Parkins v. Dunham, 3 Strob. 224; Andrews v. McDade, 201 S.C. 24,21 S.E.2d 202. Since the parties have agreed that all issues of fact and law may be decided by me, I sit not only as judge but as jury in passing upon this matter. Therefore, it is my duty to decide this issue on the weight of the evidence and the applicable law.
Under the evidence and the law I find and conclude that the Summit sand pit and the machinery, equipment and tracks thereon have been abandoned.
The defendant discontinued operating the entire Summit sand pit which is one of the two leased properties in January, 1948. In that month she shipped the last car of sand which *Page 494 
was moved out of that pit. Since that time the defendant has not operated the pit though she kept a part-time caretaker on the property at the expense of $25.00 per month, and this caretaker occasionally sells a load of sand to a purchaser who brings his own truck and his own labor to the pit. This sand sells at 50 ¢ to 60 ¢ a load and the total amount sold in the last twelve months will aggregate about $135.00. In my judgment this token sale of sand does not prevent the Court from considering the pit as abandoned.
Since January, 1948, the lessee has done no maintenance or repair work on the machinery, the tracks or rails on this property. She has allowed all of this machinery and equipment to fall into disrepair, weeds to grow up over the engine, has removed the main gear (and made no effort to repair or replace) and the running equipment on the shovel, and blocked it up, she has allowed the sand to cover and the weeds to grow over the tracks, the tank is ready to fall down from disuse, the cross-ties have rotted out, the tenant house on the property has been vacated because of needed repair. No efforts has been made to maintain in any particular.
In 1947, the defendant's three children and her daughter-in-law opened a sand pit of their own at Shuler on the Southern Railroad, and in late 1947 began operating from that plant. The effect of that operation on the plant owned by the plaintiff is shown by the comparison of the sand shipped from the three in 1947 and 1948:

 1947 1948
Summit 12,000 tons 1,155 tons
Dixiana 107,000 tons 88,355 tons
Shuler 1,200 tons (Approx.) 54,000 tons (Approx.)
 _______ ______
 Total 120,200 tons 143,510 tons

Thus while shipment of sand from the plaintiff's pits at Dixiana and Summit dropped 30,000 tons between 1947 *Page 495 
and 1948, the total amount of sand sold by the Hoefers from all three plants, Summit, Dixiana and Shuler, actually increased 23,000 tons.
The defendant admits that the contract which Southern Silica Mining and Manufacturing Company has had for many years with the Southern Railway to supply the latter with "braking" sand is now being supplied from the Shuler pit, though it is still billed in the name of Southern Silica Mining and Manufacturing Co. — F.A. Hoefer, Lessee.
It is clear that the sand business is being shifted from the pits covered by the lease and owned by the plaintiff to the property owned by the children of the lessee.
H.W. Hoefer who has managed his mother's interest at Summit and Dixiana since his father's death claims that he has specifically instructed his brother, Theodore Hoefer, who operates the Shuler plant, not to take any business away from Dixiana or Summit plants, and therefore that the fact that these two plants are managed by different members of the family is ample protection to the plaintiff that the business at Summit and Dixiana is not being shipped off to Shuler. It must be borne in mind, however, that H.W. Hoefer and his wife own a forty-five percent interest in the Shuler plant. It must be borne in mind that the Southern Railway sand business which has been supplied from Summit by the Hoefers for ten years was transferred to the Shuler pit in January-February 1948, upon the claim that there was less clay content in the Shuler sand, and therefore Mrs. Hoefer could make more money by having the sand shipped to the Southern from Shuler. It is also significant that the Summit business was discontinued just at the time when the Shuler plant came into full operation. One is presumed to intend the natural consequences of her action. It is the effect of the defendant's acts which need to be considered. Rice v. City of Columbia, 143 S.C. 516,141 S.E. 705. *Page 496 
H.W. Hoefer's testimony is a clear indication that it was and is his intent to abandon Summit. He has no plans to resume operations there. He makes no commitment to resume these operations if the lease is extended, he makes no commitment to put the machinery in running condition and his counsel actually argue that there is no point in repairing the rail line because it would not be used. The defendant's testimony is that she does not expect to operate Summit unless some unexpected sand business should turn up in subsequent years which would make it advantageous. The fact that the defendant wishes to renew the lease does not mean that she has not abandoned the Summit pit. A right once abandoned may not be revived without the consent of both parties. Keenan v. Broad River,163 S.C. 133, 135, 161 S.E. 330.
Having reached that conclusion I have come to the final argument of the defendant which is that the November 1, 1943, contract entitled her to a renewal of the lease, despite her failure to keep the property in repair, and despite the abandonment of the Summit property. In short, the argument is that so long as the rent is paid, she has a right to allow the plant at Summit to remain idle, as a standby plant, to gradually shift the business to the Shuler plant and deliver back to the plaintiff in 1953 its sand pits in non-operating condition.
This position is not sustained by a proper interpretation of the lease. Examining that document carefully it shows the purpose of the parties was to lease an existing business, not merely the land and machinery. Southern Silica Mining and Manufacturing Company at the time of the first lease had a going concern and had a live operating sand business. It was the intention of the parties that the business should be continued and when the lease was ended for any reason the property should be in such condition that Southern Silica Mining and Manufacturing Company could take over the operation without an hour's delay. *Page 497 
Many provisions in the lease sustain this interpretation. The opening clause speaks of accounts receivable which shows that the business was an operating business. The tenant was obligated to keep the machinery and equipment in repair and good running order and keep it insured. A provision was inserted looking to the purchase of new and modern machinery when the old machinery wore out. The lessor was obligated to assist the lessee in advancing "the interest of the business". The lessee was obligated to collect the lessor's outstanding accounts and turn over the proceeds. There was a special provision about the sand drying plant looking to a continuation of its operation when the lease had expired. The tenant was obligated to conduct the business under the name of Southern Silica Mining and Manufacturing Co. — F. Augustus Hoefer, Lessee, so as to preserve the value of the Southern Silica name in the sand trade. There was an express provision entitling the lessor to repossess the property if the premises or any part thereof were abandoned, and finally there was a provision against subletting.
The parties were leasing a business, not merely land and machinery. It was their intent that at the end of the lease period the lessor should be put back into possession of the plant in good running order.
The contrary argument that so long as the defendant paid the rent she could allow the machinery and equipment to fall into disrepair, discontinue the operations as she did at Summit, allow the business to be siphoned off to her children's pit at Shuler, is contrary to the language of the instrument and does not appeal to the principles of equity.
The argument by the defendant that the Courts do not favor forfeiture and therefore the option to renew must be granted, overlooks the fact that options because unilateral, are strictly construed against the party claiming the option. Pope v. Goethe, 175 S.C. 394, 399,179 S.E. 319, 99 A.L.R. 1005. Her breaches of the material *Page 498 
portions of the lease (particularly abandonment of the pit, tracks, machinery and buildings at Summit) are such as to compel the Court to deny the defendant the right to renew the lease.
It is to be noted that the parties to the 1943 contract considered abandonment of the leased premises or any part thereof such a serious breach as to justify repossession by the lessor even during the firm term (1943-1948) of the agreement. Here the plaintiff is asking for the less stringent relief of denying a renewal.
The Court has examined the lease to see if it was severable, but it is clear that the lease treats the properties at Dixiana and Summit as a unit and the abandonment clause refer to the abandonment of the premises "or any part thereof". It is not separable and this Court may not order a renewal of any part of the contract.
For these reasons it is determined, ordered and adjudged:
1. That under the contract of March 1, 1928, the plaintiff was entitled at this time to purchase the Hoefer half interest in the sand drying plant at Dixiana and the appropriate method of establishing value is that of using appraisers as provided in the contract.
2. The defendant is directed within ten days from the date of this order to name an appraiser to act with the appraiser named by the plaintiff in accordance with the terms of the contract of March 1, 1928.
3. That the defendant has breached her obligation contained in the lease agreement of November 1, 1943 to keep "all machinery and equipment in good repair and in good running order."
4. That the amount required to put the machinery, track and other equipment in good running order as of this time is $10,350.00 and the plaintiff is given judgment against the defendant for this sum.
5. That the defendant has abandoned a material part of the leased property including all of the machinery, equipment, *Page 499 
buildings, and track at Summit and the Summit sand pit itself. Under the terms of the contract this abandonment would have entitled the plaintiff to repossess the property even during the firm period of the lease.
6. That by reason of the breaches of the lease contract in the particulars set out herein the defendant has lost any right which she may have had to exercise the option to renew contained in the lease agreement.
7. That the plaintiff is entitled to immediate possession of the leased property and the defendant do deliver over this property to the plaintiff forthwith and in all events within fifteen days from the date of this order, meanwhile keeping the portion of the business now operating in good running order and in actual operation.
8. That any party have leave to apply at the foot of this decree for other and further relief.
October 27, 1949.
The decree of the circuit court in this action has been considered in the light of the questions presented by appellant. The trial record and briefs have been reviewed and we are of opinion that the decree represents the correct disposition of all of the several issues except that we think there should be a new trial upon the issue of the amount of damages or sum necessary to put respondent's industrial railroad track in repair in accord with the terms of the lease under which appellant has had possession. The decree will be reported and is affirmed and adopted as the judgment of this court except paragraph 4 of the judgment, which awards judgment against appellant in the sum of $10,350.00. It is reversed for new trial.
Defendant-appellant's motion for rehearing or new trial, which was refused, was in part upon the ground that the money judgment for repairs was excessive and with respect to it appellant discovered new evidence after filing of the *Page 500 
decree which was not before available in the exercise of due diligence. This was particularized in counsel's affidavit that after the judgment he consulted W.B. Barber, Track Supervisor of Southern Railway Company, who had jurisdiction after January 1, 1949 of respondent's industrial track, and requested him to examine the property and submit an estimate of the cost of restoring the track to condition suitable to the use for which it was intended. Barber examined the contracts in evidence between the Railway Company and respondent, which were exhibits "T" and "U", with attached plats, and stated on oath that respondent's existing track was not the track described in the contracts and shown on the attached plats. He also said that his estimate of the cost of repairs to the track, quoting. "to adequately take care of the normal use for which it is intended" was $2,508.47, which he itemized. Track Supervisor Cooper, also of Southern Railway, had testified for respondent at the trial only about a month before that his estimate was $7,728.69.
It is clear from the decree that the court mainly relied for the amount of damages upon the recited testimony of Track Supervisor Cooper, then in charge of the territory which included respondent's industrial track. Other witnesses, produced later by appellant, made much smaller estimates of the cost of putting the track in repair for use. A reading of the testimony is convincing that the conflicting standards of repair in the witnesses' minds caused the very wide divergence in their estimates which is important upon the motion for new trial, as will be seen. It appears that very shortly after the trial Mr. Cooper was succeeded as Track Supervisor of the Railway Company in that territory by Mr. Barber whose affidavit on motion for new trial states that he assumed the position on January 1, 1949.
Exhibits "T" and "U" came into the case in a remarkable manner. Appellant called as a witness T.J. Royster who was Chief Clerk to the Division Superintendent of Southern Railway, *Page 501 
apparently to prove that the cost estimate of repairs of then Track Supervisor Cooper (respondent's witness) was based upon main line requirements to which that witness testified, in effect, and that the Railway Company had but one standard which was applicable to all trackage, including industrial spurs. On cross examination by respondent's counsel the witness Royster produced, and respondent later introduced in evidence, two contracts between the Railway Company and respondent dated June 25, 1928, and Oct. 4, 1922, which became exhibits "T" and "U". They provided that respondent should at its expense maintain the trackage, quoting, "in good condition and repair and in all respects in accordance with the reasonable requirements of the Railway Company * * *." The quoted provision was read into the record by respondent's counsel, explaining, "We want to get these contracts back in Mr. Royster's file." The witness further testified that Track Supervisor Cooper was requested to estimate the repairs which would meet the requirement of the contracts, which he did.
Counsel's affidavit on motion for new trial recites that he was previously unaware of the existence of the contracts and from his examination of them and the attached plats, was unable to ascertain that the tracks therein referred to were not the track involved in the controversy and that he and his client were unable with due diligence to ascertain that important fact for lack of experience in map reading. In the counter-affidavit of respondent's counsel it is shown that he had no former knowledge of these exhibits before his cross examination of appellant's witness. Royster; that he understood from the latter's evidence that they related to the trackage in question, on which account he offered them in evidence; and they were in possession of the court from December 29, 1948 (the date of the trial) until January 28, 1949, when they were returned to the Railway Company.
This feature of the motion for new trial was refused upon the authority of Boykin v. Capehart, 205 S.C. 276,31 S.E.2d 506. However, the facts of that *Page 502 
case distinguish it and we do not think it applicable. The record in the case in hand indicates what amounts to mutual mistake of counsel. The agreements, exhibits "T" and "U", were placed in evidence by respondent, conscientiously we have no doubt, and in the belief that they were applicable to the controversy; but in that situation it does not lie in the mouth of respondent to say that appellant should have discovered the presently alleged inapplicability by the use of due diligence. Under the peculiar circumstances, it was not the duty of the one any more than that of the other. There can be no controversy that the after-discovered evidence may well change the result of the action with respect to the amount of the money judgment.
It is seen from the circuit decree, published herewith, that the amount found necessary for repairs is in lump sum without segregation of the component amounts for repair to the railroad track and for repair of the other equipment and appliances. Thus the entire money judgment will have to be reversed and the legal issue of the proper amount re-tried. In all other respects the judgment is affirmed.
Affirmed in part and reversed in part, and remanded for new trial of the stated issue of damages.