### 12369

### RICE ET AL. v. CITY OF COLUMBIA ET AL.

#### (141 S. E., 705)

1. CORPORATIONS—EQUITY REQUIRES INSOLVENT CORPORATION'S ASSETS TO BE DISTRIBUTED RATABLY AMONG CREDITORS.—Equity requires the assets of an insolvent corporation to be distributed ratably among creditors, and one claiming a departure from the rule must clearly establish his right thereto.

2. CORPORATIONS—ON CORPORATION'S INSOLVENCY, ITS ASSETS ARE IMPRESSED WITH TRUST, TO BE DISTRIBUTED RATABLY AMONG CREDITORS, SUBJECT TO LIENS.—At the very moment a corporation, banking or other, becomes insolvent, and certainly in the immediate prospect of dissolution and bankruptcy, its assets become impressed with a trust to be distributed ratably among creditors subject to liens, and the managing agents become administrators of the trust.

3. BANKS AND BANKING—TRANSFER OF INSOLVENT BANK'S ASSETS AS COLLATERAL SECURITY FOR CERTAIN DEPOSITS TWO DAYS BEFORE IT WAS CLOSED BY BANK EXAMINER HELD VOID AS TO OTHER CREDITORS.

NOTE: As to protection in equity of assets of dissolved corporation as trust fund for creditors and stockholders, see 7 R. C. L., 740; 2 R. C. L. Supp., 440; 4 R. C. L. Supp., 495; 5 R. C. L. Supp., 417.

—Transfer of choses ‘in action by insolvent bank as collateral security for certain deposits the day before the last day on which it was open for business, and before it was closed by bank examiner, *held* void as to other creditors of bank, regardless of lack of intent to hinder, delay, or defraud other creditors.

Before DENNIS, J., Richland, November, 1926.

Suit by John I. Rice and others against the City of Columbia and others. Decree for plaintiffs, and defendants appeal. Affirmed.

The following is the decree of the Circuit Court referred to in the opinion:

This cause, which was instituted in the Court of Common Pleas for Richland County, S. C., grew out of the closing of the doors of the American Bank & Trust Company of Columbia, S. C., on the 25th day of June, 1926, at which time, under a resolution adopted by the board of directors of said bank, the affairs thereof were placed in the hands of the State bank examiner.

Numerous subsidiary questions which grew out of this, the main case, have heretofore been decided by me without relating the circumstances out of which this cause originated, and without referring particularly to the nature of this action. It now seems proper to set forth these circumstances, the nature of the action, and the issues which have been made by the pleadings.

As above stated, the American Bank & Trust Company of Columbia, S. C., ceased operations as a going concern on the 25th day of June, 1926. Prior to that time, and certainly for a number of days preceding its closing and the placing of its affairs in the hands of the State bank examiner, there had been a run on the bank of a more or less quiet nature. As is always the case under such circumstances, the matter became more or less public, and the defendants above named, all of whom were advised of the fact of such run, and the likelihood of the bank failing, after making effort to procure their deposits from the bank, arranged with the officers of said bank to surrender to them certain

collaterals to secure the deposits which each of said defendants had with the bank, all of which was done within from 12 to 72 hours at most preceding the closing.

The plaintiffs who brought this action on behalf of themselves and all others likewise situated, as depositors and creditors of the bank, sought to set aside the transfer of the securities so given to each of the defendants on the grounds that such transfers constituted preferential transfers in violation of the Statute Law of this State, and were in fraud of the Statutes of Elizabeth. An injunction was sought *pendente lite,* and a rule to show cause was issued by Hon. Wm. H. Townsend, Judge of the Fifth Judicial Circuit. Upon demurrers to the complaint and returns to the rules to show cause, it was adjudged among other things that the demurrers should be overruled, the returns to the rule to show cause be declared insufficient, and an injunction granted pending the final determination of the issues raised by the pleadings. Subsequently the defendants answered; the answer in each instance setting up the same defense and praying for a dismissal of the complaint.

Briefly summarized, the answers set forth that the defendants, "having heard rumors concerning the solvency" of said bank and having had on deposit with the bank large sums of money, "insisted that they desired to withdraw the funds, * * * or that they be given security by way of surety bonds or otherwise for the protection of said deposit. Thereupon it was agreed between the aforesaid bank * * * that the bank would furnish sufficient of its notes open and collateral, bills of exchange, and other evidences of debt ample to protect the funds * * * on deposit in said bank."

The answers of the City of Columbia and County of Richland further set up that the deposits constituted debts due to the public, and were "entitled to be preferred in the settlement of insolvent estates, and have a right to demand and obtain security for such debts." The answers then set forth that the securities so obtained were not obtained with

any purpose on the part of the defendants to hinder, delay, or defraud other creditors of the American Bank & Trust Company, but were taken solely for the purpose of protecting public funds on deposit in said bank, and that the defendants did not know, "and does not now know, that the American Bank & Trust Company was or is insolvent."

The City of Columbia, in addition to answering, served a notice on the plaintiff of a motion to require the plaintiff to elect between the first and the second causes of action stated in the complaint; that is to say, to require the plaintiff to elect whether they would proceed under the first cause of action in which it sought to set aside the transfers as preferential transfers, or the second cause of action, as amended, seeking to set aside the transfers as in fraud of the Statute of Elizabeth of this State. Without making a definite ruling, but indicating that such election could not be required, but that the plaintiff had a right to proceed under both causes of action, the Court suggested that, after all of the testimony was in, the motion might be renewed, if counsel so desired, and with this suggestion the causes proceeded to trial, and were concluded without any further references to the motion requiring an election, but, on the other hand, were argued by all concerned both under the first and second causes of action; that is to say, the plaintiffs contended that they were entitled to recover under both causes of action and the defendants opposing this view.

It is well to state that each of the defendants took the position that entirely different circumstances surrounded the taking of securities by each of them, and that accordingly separate trials should be had. This was conceded and accordingly the plaintiff put in its testimony separately with regard to transfers to the City of Columbia, Richland County, and John L. Mimnaugh, administrator, and then each of the defendants offered their testimony under the defenses interposed.

I have given most careful consideration to the matter, and I desire first to briefly state the facts in regard to the transfer to each of the defendants before announcing my final conclusion.

### As to the City of Columbia

The testimony in the matter of the transfer to the City of Columbia showed that, on Tuesday of the week in which the bank ceased to operate (the closing taking place on Friday), Mr. D. W. Robinson, an attorney of the Columbia bar, having heard that a quiet run was in process on said bank, called to his office Mr. C. C. Stanley, one of the commissioners of the City of Columbia, and advised him of the fact, and further advised him that, if the City of Columbia had any funds on deposit, they had better withdraw the same at once. Following this conversation, Dr. L.. B. Owens, mayor of the city, in company with the city treasurer, went to Mr. Robinson's office, having been advised by Mr. Stanley of his conversation with Mr. Robinson, and Mr. Robinson repeated what he had said to Mr. Stanley to the Mayor and City Clerk and Treasurer. Following this, the Mayor and City Clerk called at the American Bank & Trust Company, and, in conversation with J. P. Matthews, chairman of the board of directors of said bank, told him of the information which they had received, and made some demand for the money which the city had· on deposit. Mr. Matthews assured the officials that the bank was entirely solvent; that it could not cash a check for the deposit at that time; but that, if given time, arrangement could be made. As set forth in the answer, the Mayor of the City insisted either upon the payment of the deposit or the securing of the same, and it appears to have been agreed to give securities.

Following this conversation, Mayor Owens returned to the office of Mr. Robinson, and employed him to assist the

City Attorney in procuring securities to protect the deposit, and in accordance with this employment the bank was notified by letter signed by D. W. Robinson and C. S. Monteith, as attorneys for the City of Columbia, giving the bank until 1 o'clock Thursday, June 24th, to give collaterals as security for the deposit.

Dr. Owens, the Mayor, stated on the stand that his purpose in obtaining the security was to protect against the failure of the bank (and the undisputed testimony establishes that at the time the bank was, and had been for some time prior thereto, insolvent). As a matter of fact, the report of the State bank examiner made in July, 1925, showed that the capital stock of the bank was impaired, and there was no showing that between that date and the date of the closing it had been solvent at any period.

It is true that the Mayor stated that he felt reassured upon the asurance given him by Mr. Matthews that the bank was solvent, and that he took the securities because of the fact that he had decided upon a policy of securing all of the deposits of the City of Columbia. However, the Mayor and City Clerk admitted that at no time prior thereto had the City of Columbia obtained any security at any time from any bank for its deposit, nor since said time had it so obtained securities, and this testimony of the Mayor must be taken in connection with his further statement that his object in taking the securities was to protect against the failure of the bank.

Mr. Robinson testified that no examination or valuation of the securities offered was made, but that they took all that they could get and the best that could be obtained. This was done without indorsement of any of the notes, or other evidences of debt, and without any calculation or indorsement as to the amount or sufficiency of the same.

### As to the County of Richland

The testimony with regard to this transaction was given by Mr. H. N. Edmunds, Mr. W. T. Aycock, and Mr. A. C. Tobias, Jr., all of whom are attorneys for the plaintiff, and who had conversations with Mr. W. M. Mobley, Treasurer of Richland County, prior to the failure of the bank and before their employment. Their testimony is uncontradicted and established that, soon after the City of Columbia received its securities Mr. Mobley, having heard of the condition of the bank—that a run was being made on it, likewise demanded upon Mr. Matthews for securities to protect his deposits, and that certain notes and other evidences of debt were turned over to him. Mr. Mobley told Mr. Tobias that he was not satisfied with the amount of the securities which he had obtained, and importuned Mr. Tobias to intercede with Mr. Matthews so that additional security might be given him to protect his deposit. This Mr. Tobias declined to do, among other reasons, because he was not the attorney for the County of Richland. On the evening of the day the bank closed, not to reopen again, and, while the directors were in meeting making some effort to adjust its affairs, Mr. Mobley fell in conversation with Mr. Aycock and Mr. Edmunds, and told them that he had been very uneasy for the last two or three days, scarcely able to sleep because of his worry over the situation regarding his deposit, and expressing the hope that some way might be found so that the bank could resume business. At that time it had not been definitely decided that the bank would not open the next morning. As stated, the testimony given by plaintiffs' witnesses is uncontradicted, and there is no testimony on the part of the County of Richland and no statement made with regard to the matter, other than that contained in its verified answer which makes the admissions referred to in the opening part of this decree.

### AS TO JOHN L. MIMNAUGH, ADMINISTRATOR

"This defendant had on deposit the sum of $20,000. His attorney, Mr. John J. Earle, had heard rumors concerning the run on American Bank & Trust Company, and accordingly he had prepared a check for Mr. Mimnaugh to sign and present to American Bank & Trust Company for the deposit in question. It seems that Mr. Mimnaugh was out of the City of Columbia the day the check was drawn, but returned the next morning, which was June 25th. He took the check to Columbia National Bank for the purpose of depositing the same, and was advised by Mr. Berry, the president of the bank, that the Columbia National Bank did not care to handle the check, but that he (Mr. Mimnaugh) had better present the same to American Bank & Trust Company and obtain funds upon it. Mr. Mimnaugh accordingly went to American Bank & Trust Company, where he saw Mr. Matthews, and made presentation of the check. Mr. Matthews stated to him that the bank was embarrassed at that time, and could not pay the check, but that he expected to make arrangements with some parties during the day— that "a quarter of a million dollars was all that was needed," and that he then would be able to take care of the item presented by Mr. Mimnaugh, and that in the meantime he would give him security for the check. This security Mr. Mimnaugh accepted, and stated that he did so in order to protect his deposit in case the bank failed. This happened the last day the bank was open.

### DECISION ON THE POINTS AT ISSUE

It seems to me that the testimony regarding each of the transfers entitles the plaintiff to recover under both causes of action. They are clearly in violation of the Statutes of Elizabeth as contained in Section 5218, Volume 3, of the Code of Laws of South Carolina, 1922; and, further, that

the transfers of such as are inhibited under the provisions of Section 5512, Volume 3, of the Code of Laws, 1922.

In the case of *Lenhardt v. Ponder,* 64 S. C., 354; 42 S. E., 169, the elements which must be necessary in order to set aside the transfers under the Statute of Elizabeth and under the assignment law are announced in the opinion of Mr. Justice Gary. Under the Statute of Elizabeth the opinion states that the transfer must either be (1) without consideration, or (2) that it must be *mala fide* as to both parties to the instrument. The amended complaint set forth that the transfer was without "present consideration," and counsel admitted that the transfer in question cannot be set aside under the Statutes of Elizabeth, on the ground that it was without *any* consideration, because of the fact that the indebtedness of the bank to the depositor would be sufficient consideration to support the transfers, unless the testimony showed that such transfers were *mala fide* as to both parties to the instrument. The matter then to be decided is, What was the attitude or purpose of the parties in interest, the one in making the transfer and the other in receiving the transfer? In determining this question, it is impossible to reach a conclusion except by judging that the intention of the parties is that which necessarily followed from the consequence of their acts. The principle is well stated in the case of *Freeman v. Pope,* 5 Ch. App., 538, in which Lord Hatherley, L. C., says: "It would never be left to a special jury to find, simpliciter, whether the settlor intended to defeat, hinder or delay his creditors, without a direction from the Judge that if the necessary effect of the settlement was to defeat, hinder, or delay the creditor, that necessary effect was to be considered as evidencing an intention to do so. A jury would undoubtedly be so directed, lest they should fall into the error of speculating as to what was actually passing in the mind of the settlor, which can hardly ever be satisfactorily ascertained, instead of judging of his intention by the necessary consequence of his act, which

consequence can always be estimated from the facts of the case. * * * But it is established by the authorities that in the absence of any such direct proof of intention, if a person owing debts makes a settlement which subtracts from the property which is the proper fund for the payment of that debt, an amount without which the debts cannot be paid, then, since it is the consequence of the settlement (supposing it effectual) that some creditors must remain unpaid, it would be the duty of the Judge to direct the jury that they must infer the intent of the settlor to have been to defeat or delay his creditors, and that the case is within the Statutes."

This principle is likewise announced in Jones on Evidence, at Sections 27 and 28, where he sets forth that, if the result of the act is to give a preference, the intention to do so is presumed. To like effect is the statement in 12 R. C. L., 537–539; and in our own case of *Mann v. Poole,* in 40 S. C., 11; 18 S. E., 145, 889, after the Court states that the time to secure and protect a loan is when the loan is made, the Court goes on to state that the evidence may compel but one conclusion as to a preference.

When these principles are applied to the facts of each of the transfers, it is found, on the part of American Bank & Trust Company, it was and had been in an insolvent condition for a long period of time, and, in any event for some time prior to June 25th was insolvent, from which it follows that the officers of the bank know that the effect of making the transfers would be to take from the fund of an insolvent institution a considerable portion of its assets upon which its general creditors must depend for the payment of their claims, and that by so doing they would either be defeated, hindered, or delayed in the payment of their claims. This fact alone would impute bad faith to the bank in making the transfers, and, when this fact is taken in connection with the other badges of fraud which will be enumerated, and which apply alike to the transactions with

the City of Columbia, the County of Richland, and John L. Mimnaugh, administrator, no doubt remains in my mind as to the *mala fides* of the transaction. The following are recognized generally as the badges of fraud referred to:

First. The transaction was not in the *usual course or mode of doing business.* None of the depositors in question had required theretofore any security for their accounts, and it is most unusual for such depositors to require, or for a bank to give, such securities, and that the only explanation of this unusual transaction is to be found in the situation presented to the mind of all the parties interested. The bank was alarmed over its own situation, and these depositors were alarmed concerning their deposits. They had all heard rumors as set forth in their respective answers, and were eager to protect themselves against the failure of the bank, in the event of which failure they necessarily knew that, if the transfers to them went unchallenged, they were to receive undue consideration and perhaps payment in full at the expense of other depositors.

Second. Another badge of fraud is *secrecy or haste.* It is true that there does not seem to have been any undue secrecy, but that the transaction was put through in extraordinary haste cannot be denied. Time was not taken for the securities to be indorsed over, nor any formal assignment of them made. There seems to have been nothing except "a list of collaterals" turned over to the City of Columbia and to the County of Richland. Such haste indicates but one thing, and that is that the parties knew, or had reasonable cause to believe, that the bank was in imminent danger, and a desire to get the transaction closed before the bank should suspend business. With such in mind it necessarily follows that they knew that the securities which were being gotten would injure the other depositors. (Besides this, the law of this State is that a bank is insolvent when it is unable to meet its deposits upon the presentation of checks, and these depositors knew that that fact existed,

and must have necessarily known further that a bank which cannot meet its deposits must close its doors.) These facts were known by all three of the defendants, because all three had presented demand for the payment of their deposits, and the bank had been unable to produce the cash or to arrange for the same.

Third. *Failure to examine, value or appraise the securities* is a third badge of fraud. In the case of the City of Columbia, Mr. Robinson, who acted on behalf of the City, testified that he took such securities as were offered him without examining the same, being glad to get anything he could get; and Mr. Mobley apparently did not examine his securities because he said he did not know whether they were good or not, stating further that he got what was left. .It therefore seems clear that his idea was to get what he could get without any regard to the value of the securities, and he did this with full knowledge of the situation.

Fourth. ˙ A fourth badge of fraud in a case of this character is set forth in 27 C. J., 494, which is likewise authority for the first three badges of fraud referred to, is. the *failure to testify* with regard to the matter. This particular badge of fraud relates to the matter of the transfer to Richland County. Reference has already been made to the fact that Mr. Mobley did not offer any testimony at all. Nor was any one else offered on behalf of Richland County as a witness. The authority referred to on this matter reads in part as follows: "Where the circumstances under which a transfer of property by a debtor is˙ made are suspicious, the failure of the party to testify or to˙ produce available explanatory or rebutting evidence is a badge of fraud. ˙ The presumption is that if they could have truthfully testified to facts showing the *bona fides* of the conveyance, they would have done so. It is wholly immaterial that their failure or refusal to do so is based on the advice of counsel." Unquestionably a strong *prima facie* showing was made by the plaintiff against the County of Richland

and the failure of the County to meet it is conclusive against it. With regard to the City of Columbia and John L. Mimnaugh, such testimony as was offered not only failed to meet the case of the plaintiff, but in fact strengthened it.

What has been said about well-recognized badges of fraud applies to any insolvent. When the matter of insolvency relates to a bank, however, it must be remembered that a banking institution occupies a peculiar position towards the public. Such corporations are institutions of a *quasi*-public nature. At any rate, they are created for the purpose of performing a public service, and the public generally is invited to deal with them, especially as depositors, on an equal basis. There is no assumption of such an institution being able, when it is considering closing its doors on account of insolvency, to transfer to any of its depositors security for deposits in preference to other depositors. In the case of *Livingstain v. Columbian Banking & Trust Co.,* 77 S. C., 305; 57 S. E., 182; 22 L. R. A. (N. S.), 442; 122 Am. St. Rep., 568, Mr. Justice Woods, in speaking with reference to this particular matter, says: "No rule of equity appeals more to the judicial conscience than that which requires the assets of an insolvent corporation to be distributed ratably among creditors."

He then reviews certain of the facts in the case, and says:

"Had its condition been known, the Court of equity, before the checks were signed, on the application of any creditor, would have taken charge of all of the assets, and its main purpose in doing so would have been to prevent any preference among creditors and secure a distribution *pro rata* among all. This was an equity to which all creditors were entitled at the moment of insolvency, before the checks were issued to petitioners, and, therefore, the equity of equal distribution was superior in point of time to any alleged equity of subrogation.

"If embodied equity could have stood at the counter of the Columbian Bank, by its mandate it would have forbidden the issuing of the checks; and by its hand, it would have taken possession of the assets, including the collateral in the hands of the Bank of Commerce, to the end that the assets should be equally distributed among creditors and that none should have preference. How then can the Court of equity be asked today to use its power to accomplish that which yesterday it would have used its power to prevent as inequitable and unjust?

"Therefore, the issuing of the checks to these depositors was inequitable with respect to other depositors, because the bank was actually then insolvent and all of the depositors had the equity of equal distribution of the assets."

This principle of equity was again recognized by the Supreme Court in the case of *Citizens' Bank of Pinewood v. Bradley,* 136 S. C., 514; 134 S. E., 511, when Mr. Justice Cothran, the writer of the opinion, says: "I begin the discussion with the very clear, strong, and just declaration made by the Court (Mr. Justice Woods writing the opinion) in the case of *Livingstain v. Bank,* 77 S. C., 305; 57 S. E., 182; 22 L. R. A. (N. S.), 442; 122 Am. St. Rep., 568, 'no rule of equity appeals more to the judicial conscience more than that which requires the assets of an insolvent corporation to be distributed ratably among creditors.' He who claims a departure from this rule must establish his right clearly."

Applying this principle of equity to the facts in the present cause, no other conclusion can be reached than that the transfers from the American Bank & Trust Company to the City of Columbia, to Richland County, and to John L. Mimnaugh, as administrator, were in fraud of the Statutes to Elizabeth, and that the defendants failed to establish a right of departure from the rule just referred to.

A great deal of what has been said with reference to the facts in the case apply equally to the cause of action seeking

to set aside the transfers as preferences as well as transfers in fraud of the Statutes of Elizabeth. The requisites, four in number, set out in the case of *Lenhardt v. Ponder, supra,* which must be met in order to set aside a preference, have been met in this cause, and will be referred to more particularly in the latter part of this decree. Under the view which I take of the matter, the plaintiff is entitled to recover under this cause of action as well as under the cause of action relating to fraudulent transfers under the Statutes of Elizabeth.

It is admitted by both sides to the controversy that the several assignments of collateral, or, more correctly speaking, the deposits of collateral with the defendants herein, do not constitute an assignment under Section 5511, Volume 3, of the Code of Laws of South Carolina, 1922. It is contended by the plaintiff, however, that the transfers constituted preferential transfers inhibited by Section 5512, and in connection with such contention the defendants the City of Columbia and Richland County claim that "debts due the public" may be preferred. In considering this cause of action, I have given the most careful consideration to the position taken, and have come to the conclusion that debts due the public can only be preferred by the voluntary act of the assignor making a general assignment under Section 5511. This Section provides that, when one makes an assignment for the benefit of creditors, he may, if he sees fit, provide that debts due the public shall be preferred. This right of preference in such an assignment, in so far as it favors debts due the public and one other, is in derogation of the common law of this State, which is that the sovereign in the matter of debts stands upon the same footing as any other creditor, and that debts due the public have no precedence over debts due other persons. *State v. Harris,* 2 Bailey, 598.

It follows then that, unless the Statute which gives this right of preference is strictly followed, no such preference

can be enforceable. As stated, it was admitted by both sides to the controversy that the transfers did not constitute an assignment under Section 5511. The remaining question then is, Do such transfers constitute preferential transfers under Section 5512, which may under the circumstances of this case be set aside? Undoubtedly, under the terms of this Section the Legislature designed to prevent a debtor from circumventing with his creditors, or any of them, the provisions of Section 5511. The term used is "in fraud of this chapter," which clearly means some act done in order to avoid the provisions of Section 5511. The inhibition set forth in Section 5512 is in giving any preference to any creditor within 90 days preceding the making of "an assignment for the benefit of creditors," and this Section does not in terms, nor by implication, make any exception as to a preference in favor of debts due the public. The purpose of "an assignment for the benefit of creditors" under Section 5511 is to effect a transfer to certain assignees of all of the property of the debtor to be administered by the assignees for the benefit of its creditors. Any debtor has a right to make such an assignment, and in such an assignment to create a preference in favor of debts due the public, but, if he has not made such an assignment, debts due the public as above set forth have no superior standing, and any other instrument under which it is attempted to prefer such debts, not being authorized by law, will be ineffective to create such a preference in favor of such debts.

It follows, therefore, that the transfers made to the City of Columbia and Richland County, not having been embodied in a voluntary conveyance by the bank of all of its property to assignees for the benefit of all of its creditors, but having been made by separate instruments in their favor, and for their sole benefit, cannot be in any sense regarded as a preference which may be made in favor of debts due the public under the provisions of Section 5511, but must be regarded as preferential transfers which are null and void

under Section 5512.  See the cases of *Haynes v. Hoffman,* 46 S. C., 157; 24 S. E., 103.  *Durham Fet. Co. v. Hemphill,* 45 S. C., 621; 24 S. E., 85.  *Adler v. Cloud,* 42 S. C., 272; 20 S. E., 393.  *Armstrong v. Hurst,* 39 S. C., 498; 18 S. E., 150.

Such being so, it only remains to inquire whether the requisites necessary to set aside such preferential transfers have been met under the existing law of this State.  The case of *Lendardt v. Ponder, supra,* sets forth the requisites necessary in such cases to be four in number, to wit: First, that the debtor was insolvent at the time of the making of the transfer; second, that he intended to prefer; third, that the grantee had reasonable cause to believe that the grantor was insolvent; and, fourth, that the grantee had reasonable cause to believe that the conveyance was made in fraud of the assignment laws.

What was said in dealing with the testimony and its application to the Statute of Elizabeth clearly establishes that all four requisites have been met, and admit of no serious contention with regard thereto.  The testimony clearly established that the debtor was insolvent at the time of the making of the transfer; that the necessary consequences of this act was to prefer the creditors in question, from which the intention to prefer must be assumed; that the grantee knew that the bank could not pay their checks; that a run was being made on it, and consequently knew, or had reasonable cause to believe, that the debtor was insolvent; that the grantees had constructive knowledge of the public Statute of this State providing against preferences and providing the only manner in which a preference in favor of the public debt could be made, from which it follows that the grantees, the City of Columbia and Richland County knew, or had reasonable cause to believe, that the transfers were in fraud of the assignment laws.

The defendants, the City of Columbia and Richland County, have, however, taken the position that, in order to

set aside such transfers in any event, such transfers must be followed within 90 days by a general assignment. Our Court has decided in the case of *Menhard v. Youngblood,* 41 S. C., 312; 19 S. E., 675, that any act on the part of a debtor which amounts to a general assignment will be treated as a general assignment. In the case cited, the debtor had permitted attachment to be obtained against practically all of his property by a number of his creditors to the detriment of certain of his other creditors. The Court held that such act constituted a general assignment of property with unlawful preferential transfers to the creditors in question in violation of the Statute Law of the State.

In the present cause, within from 12 to 72 hours after having transferred to the defendants herein, assets in the form of promissory notes, bills of exchange, and other securities to the amount of approximately $350,000, the American Bank & Trust Company was placed in the hands of the State bank examiner. Applying the principle set forth in the case of *Meinhard v. Youngblood, supra,* the effect of what was done is the same as that of an assignment, though not the same in character. This is especially true when the act of placing the bank in the hands of the bank examiner is followed by a receivership. Were this not true, a bank in failing circumstances could within a few hours prior to closing its doors prefer certain creditors to the exclusion of others, and a defense against the act would lie because the doors were closed without making a general assignment. Such a defense would be in the teeth of the principles set forth in *Livingstain v. Columbian Bank, supra,* and cannot receive recognition.

It is therefore ordered, adjudged, and decreed that the plaintiffs are entitled to, and are hereby given, judgment as follows:

(1) Against the City of Columbia, Richland County, and John L. Mimnaugh as administrator of the estate of James Mimnaugh, deceased, for a cancellation of the assign-

ments or memorandums of deposit whereby the American Bank & Trust Company transferred to said defendants on or about the 23d, 24th, and 25th days of June, 1926, certain securities, a complete list of which have heretofore been furnished by said defendants to James E. Peurifoy, receiver of said American Bank & Trust Company.

(2) That all of said securities be, and the same are hereby, declared to be the proper goods and chattels of the said James E. Peurifoy, receiver, as aforesaid, the same to be taken in charge by him and administered as other assets of said bank.

(3) For the costs of this action which shall be taxed by the Clerk and entered up forthwith as a part of this judgment against said defendants.

(4) For the right for the said James E. Peurifoy, receiver, to apply at the foot of this decree and judgment for any other and further orders which may be proper to carry the same into full effect.

*Messrs. Melton & Belser,* and *C. S. Monteith,* for appellants, cite: *Right to prefer creditors:* 15 R. C. L., 572–574; 2 R. C. L., 690; 3 R. C. L., 645; 5 C. J., 1150; 3 A. & E. Enc., 71; 2 Coll. on Bkr., 1246; 27 S. C., 284; 126 S. C., 65; 44 S. C., 190; 134 S. C., 233; 2 Hill Eq., 443; 9 Rich. Eq., 257; 2 Bail., 598; 2 Hill Eq., 256; Id., 600; 1 Des. Eq., 450; 23 S. C., 116; 26 S. C., 447. *Preference of city's deposit expressly exempted under terms of Sec. 5511, Code:* 5 C. J., 1155. *Same, not avoided under Sec. 5512, Code:* 5 C. J., 1155. *When bank insolvent:* 33 S. C., 469; 81 S. C., 244; 1 Coll. on Bkr., 19, 22; 2 Coll. on Bkr., 1250, 1305; 20 L. Ed., 481; 21 L. Ed., 504; 42 S. C., 475; 44 S. C., 227; 53 S. C., 364; 218 Fed., 673; 72 A. S. R., 53. *No reasonable cause to believe transfer made in fraud of assignment act:* 25 S. C., 467; 26 S. C., 609; 45 S. C., 621; 46 S. C., 157; 55 S. C., 198; 46 S. C., 166. *When fraudulent:* 134 S. C., 233; 126 S. C., 65; 41 S. C., 312; 44 S. C., 183. *Plaintiffs*

*should have been required to elect between inconsistent causes:* 138 S. C., 74; 136 S. C., 231; 33 S. C., 538; 39 S. C., 66; 27 C. J., 534; Id., 499; 28 S. C., 442; 56 S. C., 169; 109 S. C., 276; 12 R. C. L., 531-533; 64 S. C., 362; 112 S. C., 279; 122 S. C., 403; 129 S. C., 426; 37 S. C., 319; 129 S. C., 425; 27 S. C., 286; 56 S. C., 154; 12 S. C., 154. *Conveyances to defraud creditors void:* Sec. 5218, Code. *Voluntary transfers held to be constructively fraudulent and void:* 64 S. C., 364; 27 S. C., 284; 109 S. C., 276. *When there is valuable consideration, there must be actual fraud or mala fides on part of both grantor and grantee:* 56 S. C., 154; 122 S. C., 403; 129 S. C., 425; 12 R. C. L., 533; 27 C. J., 499; Pom. Eq. Jur., 418. *Antecedent debt such as existed in case at bar constituted valuable consideration, and there was no necessity for there being a "present consideration":* 27 C. J., 534-536; Id., 630-632. *Cases distinguished:* 34 S. C., 1; Rich. Eq., 122; 112 S. C., 279; 5 Ch. App., 538; 12 R. C. L., 537-539.

*Mr. W. C. McLain,* for appellant Richland County.

*Messrs. Weston & Aycock, H. N. Edmunds,* and *A. C. Tobias,* for respondents, cite: *Preferential transfers:* 14 Fed. (2nd), 306; 2 Bail., 698; 23 S. C., 114; 68 S. C., 328; *Sec. 5511, Code, does not apply to case at bar:* 22 S. C., 108; 134 S. C., 233. *Transfers at bar null and void under Sec. 5512, Code:* 46 S. C., 157; 45 S. C., 621; 42 S. C., 272; 39 S. C., 498. *Reasonable cause to believe insolvency:* 101 N. E., 424; Sec. 1820, Rem. on Bkr. *"Insolvency":* 33 S. C., 451; 44 S. C., 227; 5 Cyc., 560; 81 S. C., 244; 13 L. R. A. (N. S.), 185; 97 S. E., 888. *Knowledge of insolvency:* 111 S. C., 330; 106 S. C., 322; 6 S. E., 636; 150 N. C., 970; 67 S. E., 328; 108 S. E., 895; 94 S. E., 916; 3 Rich. Eq., 41; 1 McC., 231; 2 Pom. Eq. Jur., 1154, Sec. 607. *Intention of parties:* 40 S. C., 10; 5 Ch. App., 538; Pom. Eq. Jur., (3rd Ed.), 1794, Sec. 970; Jones on Ev. (2nd), Sec. 27. *Badges of fraud:* 27 C. J., 491; Id.,

633; 495. *Equity requires assets of insolvent corporation to be distributed ratably among creditors; one claiming departure from such rule must establish right clearly:* 134 S. C., 511; 77 S. C., 305.

February 4, 1928.

The opinion of the Court was delivered by Mr. Justice Cothran.

The case involves the right of the receiver of the American Bank & Trust Company to recapture a vast amount of choses in action, delivered by J. Pope Matthews, a high official of the bank, to the City of Columbia, the County of Richland, J. L. Mimnaugh, administrator of the estate of James Mimnaugh, deceased, as collateral security for certain deposits to their credit, severally, in the bank, on June 24, 1926, the day before the last day upon which the bank was open for business. The bank closed at the usual hour on the 25th, 2 p. m., and, in consequence of the action of the directors in the evening of that day, or night, it was placed in the hands of the state bank examiner on the morning of the 26th, and never reopened. On July 19th James E. Peurifoy was, in the above-stated case, appointed receiver of the bank, and qualified the next day, within the 30-day period allowed by the Statute for possession and control by the bank examiner. While the action was originally instituted by the plaintiffs as creditors of the bank, "on or about July 1, 1926," it appears to have been continued, without objection, in the right of the receiver appointed on July 19th. I will so consider it.

It appears that on June 24th the City of Columbia had to its credit as a depositor in the bank $180,000; the County of Richland, $135,000; and J. L. Mimnaugh, administrator, $21,100—a total for the three of $336,100.

On that day, under circumstances hereinafter detailed, J. Pope Matthews, chairman of the board of directors of the bank, delivered to the above-mentioned depositors at different times, during the day, batches of choses in action due to the

bank, listed but unindorsed, as collateral security to those deposits, in total amounts practically equal to the deposit credits respectively. As stated above, the bank continued in business until the closing hour on the 25th, and the next day, the 26th, posted a notice upon the door that it had passed into the hands of the bank examiner.

The complaint attacks the validity of these several transfers upon the grounds that they are in contravention of the assignment law and of the Statute of Elizabeth.

The plaintiffs applied for an injunction *pendente lite,* and obtained from his Honor, Judge Townsend, a temporary restraining order and a rule to show cause why the injunction should not be granted. The defendants, at the hearing before Judge Townsend, filed demurrers to the complaint and returns to the rule. The demurrers were overruled, the returns were adjudged insufficient, and the restraining order continued until the hearing upon the merits. The order restrained and enjoined the defendants from further converting any of the choses in action to their own use, but permitted the defendants to make collection of them, provided that such collections should be retained in place of the choses in action until the final determination of the action.

The defendants City of Columbia and Richland County answered the complaint, denying the right of the plaintiff to recover the securities pledged, under any of the alleged causes of action, and denying that either had any knowledge of the alleged insolvency of the bank, or had any intention in the transaction to hinder or delay any of the other creditors of the bank; alleging, on the contrary, that their sole purpose in obtaining the securities was to protect their deposits, and that their debts as debts due to the public were entitled to be preferred under the Statute.

The defendant Mimnaugh, administrator, answered, setting up the same defenses, except that no right to preference was claimed for his debt as one due to the public.

The case then came on for trial by his Honor, Judge Dennis, before whom the witnesses were examined in open Court. On December 15, 1926, his Honor filed a decree, which will be reported, in which he sustained the attack upon the transfers, and adjudged that the securities be returned to the receiver to be administered as assets of the bank.

We do not deem it necessary to consider the grounds of attack upon the several transfers, as in violation of the Statute in reference to "assignments for the benefit of creditors," or as in contravention of the Statute of Elizabeth, invalidating conveyances or transfers intended to hinder, delay, or defraud the creditors of the debtor making such conveyances or transfers, for the reason that the transfers were invalid upon the plainest principles of equity growing out of the rights of all creditors of an insolvent corporation, in the throes of dissolution, to an equitable distribution of its assets.

In the circuit decree his Honor, Judge Dennis, declares:

"* * * The undisputed testimony establishes that at the time (of the transfers), the bank was, and had been for some time prior thereto, insolvent."

His Honor's finding of fact is not only sustained by the preponderance of the evidence, but is established beyond a reasonable doubt. A résumé of the evidence upon this point will subserve no useful purpose, and we shall procede upon the absolute correctness of the Circuit Judge's finding.

We begin the discussion, as was done in the case of *Citizens' Bank v. Bradley,* 136 S. C., 511; 134 S. E., 510, with the very clear, strong, and just declaration made by this Court (Mr. Justice Woods writing the opinion) in the case of *Livingstain v. Bank,* 77 S. C., 305; 57 S. E., 182; 22 L. R. A. (N. S.), 442; 122 Am. St. Rep., 568:

"No rule of equity appeals more to the judicial conscience more than that which requires the assets of an insolvent corporation to be distributed ratably among creditors,"

—to which was added, in the *Bank v. Bradley case*::

"He who claims a departure from this rule must establish his right clearly."

The necessary, inevitable result of this conclusion is that the very moment a corporation, banking or other, reaches the point of insolvency (presumptively, as a matter of course, to the knowledge of the managing agents of the corporation), certainly in the immediate prospect of dissolution and bankruptcy, its assets become impressed with a solemn trust to be distributed ratably among its creditors, subject, of course, to liens; and the managing agents become the administrators of that trust. This is so manifestly just and right as to appeal instantly and most strongly to the conscience of a chancellor.

As is said by Mr. Justice Woods in the case of *Ex parte Berger,* 81 S. C., 255; 62 S. E., 249; 22 L. R. A. (N. S.), 445:

"At the moment of insolvency of the bank substantial justice, which in this case is that equality which equity always seeks to enforce, required ratable distribution of the assets. The payment to Berger of this deposit operated as a preference, whether unlawful or not, and tended to defeat the equity, the substantial justice of ratable distribution."

The *Berger case* was an offshoot of the case of *Livingstain v. Bank,* 77 S. C., 305; 57 S. E., 182; 22 L. R. A. (N. S.), 442; 122 Am. St. Rep., 568, above referred to, and while the foregoing extract is from the dissenting opinion of Mr. Justice Woods, it contains a clear and necessary deduction from the decision in the *Livingstain case,* approved in *Citizens' Bank v. Bradley,* 136 S. C., 511; 134 S. E., 510.

In *Dabney v. Bank,* 3 S. C., 124, it is held (quoting syllabus):

"The assets of an insolvent bank are a trust fund for the payment of its creditors, whether as guarantees, bill holders, depositors, or otherwise, and if there is no lien on the fund, the distribution among the creditors must be *pari passu.* * * *"

"The invalidity of a transfer by an insolvent bank does not depend upon the knowledge of the transferee, but upon the fact of insolvency." *Dutcher v. Bank* (N. Y.), 1 Thomp. & C., 400.

The defendant was a depositor in a savings bank, and purchased of the bank, through its president, a bond and mortgage; the defendant paying for said bond and mortgage partly in cash and partly by being debited on the books of the bank with the amount of his deposit. At the time of the purchase and transfer, the bank was insolvent, but the purchaser had no knowledge of the insolvency. Held, that the defendant should assign the bond and mortgage to the receiver of the bank on having returned to him the amount of his cash payment with interest, and being reinstated as a creditor upon the books of the bank in the amount of his deposit. *French v. O'Brien* (N. Y.), 52 How. Pr., 394.

The assets of an insolvent banking corporation are always liable for its debts, and, if distributed among stockholders or transferred to others than *bona fide* creditors or purchasers, such holders take them charged with the trust in favor of creditors, and a court of equity will follow the assets, and compel their application to the corporation debts. *Marr v. Bank* (Tenn.), 4 Cold., 471. "But the receiver of an insolvent corporation may recover against one who despoils the corporation of its assets and thus deprives the creditors of the opportunity of resorting to the trust fund for the satisfaction of their claims." 34 Cyc., 401.

In *Fitzpatrick v. McGregor,* 133 Ga., 332; 65 S. E., 859; 25 L. R. A. (N. S.), 50, a solvent stockholder of an insolvent corporation delivered to it his shares of stock in consideration that his note, held by the corporation and secured by the stock as collateral, be credited with the agreed and supposed value of the stock at the time. Both the stockholder and the president of the corporation who conducted the transaction thought the corporation solvent. The stock

was held until the corporation made a general assignment within a month or two thereafter. The Court held that the stockholder held the money or credit so received by him subject to the superior equity of the creditors of the corporation, and that a receiver afterwards appointed for the corporation could recover of the stockholder for the benefit of creditors the amount of such credit. The Court said:

"* * * If the corporation, at the time of making such purchase, is in an insolvent condition, and therefore the purchase is to the prejudice of its creditors by diminishing their chances of collecting their claims, the transaction cannot be sustained, and the selling stockholder who thus receives a portion of the capital holds the same subject to the superior equities of creditors."

"Assets of insolvent corporations, including banks, constitute trust funds for benefit of creditors." *Bank v. Williams,* 48 S. D., 529; 205 N. W., 221.

"Assets of an insolvent corporation constitute a trust fund for the payment of its debts, in which all of its creditors are entitled to share ratably; and preferences given voluntarily by an insolvent corporation are void as to nonpreferred creditors." *Nelson v. Pub. Co.* (D. C.), F., 136.

"The ground on which preferences given by corporations are held to be voidable is that when a corporation becomes insolvent, and its officers are, or ought to be, aware that it must soon cease to operate as a going concern, its assets become a trust fund, sacredly pledged, subject only to prior liens to be equally distributed, first among its creditors, and then among its stockholders." *Wyman v. Bowman* (C. C. A.), 127 F., 257.

"The property of an insolvent corporation constitutes a trust fund, pledged to the payment of all its debts, equally and ratably." *Butler v. Cockrill* (C. C. A.), 73 F., 946; *Graham v. R. Co.,* 102 U. S., 148; 26 L. Ed., 106; *Richardson v. Green,* 133 U. S., 30; 10 S. Ct., 280; 33 L. Ed., 516.

"* * * Insolvency converts the assets of a corporation into a trust fund for the equal benefit of creditors, it follows that the preference given the bank is fraudulent in law, and its lack of knowledge as to the character of the transfer and exact condition of the Williams-Fowler Company when the mortgage was executed is wholly immaterial." *Furber v. Williams,* 21 S. D., 228; 111 N. W., 548; 8 L. A. R. (N. S.), 1259; 15 Ann. Cas., 1216, citing *Ford v. Bank,* 87 Wis., 363; 58 N. W., 766; *Appleton v. Turnbull,* 84 Me., 72; 24 A., 592; 5 Thomp. Corp., § 6496; *Sanger v. Upton,* 91 U. S., 56; 23 L. Ed., 220; *Adams v. Deyette,* 8 S. D., 119; 65 N. W., 471; 31 L. R. A., 497; 59 Am. St. Rep., 751.

"Without again entering into a discussion of that question, we desire to say, in the language of *Compton v. Schwabacher Bros. & Co.,* 15 Wash., 306; 46 P., 338, that 'Whatever rule may prevail elsewhere, it is now well settled in this State that the assets of an insolvent corporation constitute a trust fund for the benefit of all its creditors.' We are satisfied with that rule." *Washington Co. v. Alladio Co.,* 28 Wash., 176; 68 P., 444; *Boyes v. Turk Co.,* 56 Wash., 515; 106 P., 475; *Benner v. Bank,* 73 Wash., 488; 131 P., 1149, An. Cas., 1914-D, 702; *Mutual Inv. Co. v. Walton Co.,* 91 Wash., 298; 157 P., 682; *Simpson v. Western Co.,* 97 Wash., 626; 167 P., 113.

See, also, *In re Fechheimer* (C. C. A.), 212 F., 357; *Holt v. Commission,* 124 Md., 66; 91 A., 874; *Garetson v. Hinson,* 69 Or., 605; 140 P., 633; *Sweet v. Lang* (D. C.), 14 F. (2d) 758; *Guaranty Bank v. U. S. Co.,* 89 Fla., 324; 103 So., 620; *Nickey v. Lonsdale,* 149 Tenn., 391; 258 S. W., 776; *Mechanics' Bank v. R. Co.,* 148 Tenn., 113; 251 S. W., 906; *Beach v. Williamson,* 78 Fla., 611; 83 So., 860; 9 A. L. R., 1438.

The circumstances under which these transfers were made strongly demonstrate the wisdom and justice of the rule of equitable distribution of the assets of an

insolvent corporation; they disclose the knowledge, or at least a strong suspicion, justified by the quick succession of events, that the vessel was upon the rocks, and a feverish activity to secure what salvage a complacent master might allow them to remove; hundreds of depositors and general creditors all over the country were put at the mercy of the unfaithful Pallinurus, and the few favored depositors who were either "on the inside" or who quickly caught wind of the coming storm and wreck. They solemnly assert their innocence of any intention to hinder, delay, or defraud the other creditors, as if their innocence can shield them from the presumption that they intended the natural consequences of their acts. The equity of the creditors generally to an equal distribution of the assets of the insolvent bank cannot be annihilated by such a quibble. It makes not a particle of difference that they intended simply to secure their deposits; the effect of their *acts* is all that needs to be considered. If they proved to be the means of thwarting that equity which so appeals to the judicial conscience, they will be utterly destroyed.

To sustain these transfers under the circumstances which appear beyond controversy would open wide the door for the most brazen acts of preference conceivable. All that the transferee would have to prove would be that he did not intend to hinder, delay, or defraud the other creditors; a position which he would have no right to assume in view of the legal presumption that he intended the natural consequences of his acts.

It is an unwarranted draft upon the credulity of this Court to contend that Matthews did not know of the insolvency of the bank, when it had in actual cash less than $10,000 and deposit accounts running over $1,000,000. It is equally so that these frightened depositors, scurrying to cover, and advised of the run on the bank, and to get what they could "and get it quick," were ignorant of conditions

To allow them, on the ground, on the inside, to pull down $340,000 of the assets, *charged with a trust,* to the detriment of hundreds less informed and not standing in with the powers that be, is "a consummation" *not* "devoutly to be wished."

We are less disinclined to take this position in view of the fact that, if this were not a bank, the corporation could be thown into bankruptcy, and the securities recovered by the trustee in bankruptcy as unlawful preferences made within the inhibited period. See *Cunningham v. Brown,* 265 U. S., 1; 44 S. Ct., 424; 68 L. Ed., 873, a case which involved the frenzied finance of the great swindler Ponzi.

Upon the question of transfer of assets to secure deposits see *Divide County v. Baird* (N. D.), 212 N. W., 236; 51 A. L. R., 296.

The judgment of this Court is that the decree of the Circuit Court be affirmed.

Mr. Justice Stabler and Mr. Acting Associate Justice Thos F. McDow concur.

Mr. Justice Blease disqualified.

Mr. Acting Associate Justice McDow: Upon the grounds and for the reasons fully set out in the circuit decree and in the opinion of Mr. Justice Cothran, I think the circuit decree should be affirmed.

Mr. Chief Justice Watts (dissenting) : This is an appeal from the decree of his Honor, Judge Dennis. His decree sets forth the issues involved, and will be reported for an understanding of the case. The appeal from the decision of Judge Dennis challenges all the material findings of fact and rulings on points of law contained in the decree. We think that an action to set aside an alleged preference must fall within the terms of the Statute. We do not think such preferences are valid as expressly authorized, but, the true view is, are invalid as expressly prohibited under the Act.

Section 5511 of the Assignment Act, Chapter 82, has rendered void any general assignment by an insolvent debtor for the benefit of creditors in which any preference has been given to creditors, except as to debts due to the public. 3 Code 1922, § 5511.

We do not think the evidence in the case was sufficient to warrant his Honor's finding that the appellants come within the provision of Section 5218 of Code of 1922 (known as the Statute of Elizabeth). In order that this statute may be applicable, it is necessary either (1) that the transfer be voluntary, in which case it is constructively fraudulent, or (2) if there be a consideration, that there be *mala fides,* that is, an active intent participated in by both the transferrer and the transferee thereby to hinder and delay the other creditors of such debtor.

None of these Statutes were intended to prohibit or affect the right of a debtor in embarrassed financial circumstances to give, or of a creditor to receive, in good faith security for a debt, which right is recognized and approved in law and in equity.

The precise questions on this appeal, aside from the matter of election, are, therefore, whether the pledge is avoided under Section 5512 of the Assignment Acts, and whether the knowledge of the city was sufficient to constitute *mala fides* under the Statute of Elizabeth, which we shall now proceed to discuss. *Mala fides* consists of actual fraud or active intent to hinder and delay other creditors. The authorities generally, and particularly the cases in this State, show that *mala fides* can only be established by a showing of actual fraud—that is, an active intent to hinder and delay other creditors. The purpose and intent within the contemplation of the act must be a positive intent, not merely to secure the creditor to whom the transfer is made, but thereby to hinder and delay other creditors. The intent to hinder and delay other creditors must enter into, and form part of,

the motive for making the transfer. In other words, there must be something in the nature of a conspiracy to defraud other creditors. We submit that this is clearly the law in South Carolina as established and uniformly applied by a long line of cases.

In the very strong and well-considered case of *Magovern v. Richard,* 27 S. C., 272; 3 S. E., 340, the Court (per Mr. Chief Justice Simpson) says:

"Now, there can hardly be a doubt, in fact, it is not denied, that Bollmann Brothers held a large claim on Richard, which this mortgage was intended to secure, so that one of the elements necessary to sustain it is present. Was it *bona fide?* or was it *mala fide* as to both parties to the instrument? because this is necessary to avoid it. What is *mala fides?* It must be an intent, not simply to assert one's own rights, but, in addition thereto, to defeat the rights of another, participated in, as we have said, by both parties to the instrument. A good illustration is found in the old case of *Lowry v. Pinson* [2 Bailey, 324; 23 Am. Dec., 140], where Pinson bought a tract of land paying full value for it, but one of the objects of the purchase was to enable his vendor to leave the country so as to escape the consequences of an action for damages against him by Miss Lowry for breach of marriage contract. Here Pinson was exercising a right of purchase, a right which belongs to every one. He paid full value for the land, but yet one object he had in buying it was to enable his vendor to defeat the action of Miss Lowry. The Court very properly held that here was *mala fides.* Now, is there any testimony in the case before us that Bollmann Brothers, while asserting their right to obtain a security for their claim on Richard, intended also to enable Richard to defeat, delay, and hinder his other creditors? The mortgage may have that effect, to the extent of the property mortgaged, but was this one of the intended effects? Did Bollmann Brothers conspire with Richard to use their claim for the fraudulent

purpose of defeating the other creditors? Was there any secret trust, benefit, or advantage secured to Richard in consideration of the mortgage? We see nothing in the case but that Richard was insolvent, and that he embraced in his mortgage his entire visible goods and chattels in his store, and that it was the understanding that the mortgage was not to be recorded for forty days."

The law in this State has never been more clearly stated than in *Lenhardt v. Ponder,* 64 S. C., 364–365; 42 S. E., 172, which quotes from many preceding cases, as follows:

"We will next consider whether the said deed was void under the Statute of Elizabeth. The rule is thus stated in *Magovern v. Richard,* 27 S. C. [272] 286; 3 S. E., 340. * * * The last-mentioned case is cited with approval in the recent case of *McElwee v. Kennedy,* 56 S. C., 154; 34 S. E., 86, in which the Court also uses this language: 'To annul for fraud a deed based upon a valuable consideration, it must not only be shown that the grantor intended thereby to hinder, delay or defraud creditors, but it must also appear that the grantee participated in such fraudulent purpose. Even if we were to assume that there is evidence of *mala fides* in the grantor, yet if the sole purpose of the grantee was to secure her claims, having no intent to hinder, delay or defeat other creditors, her title canot be affected by the *mala fides* of the grantor. The evidence fails utterly to show any intent on the part of the grantee to defraud her husband's creditors, and merely shows a purpose to secure her own *bona fide* claims. Conceding the insolvency of the firm of which the grantor was a member, it does not appear that the grantee was aware of it; and if she was aware of it, that would not show fraud in her, since a *bona fide* creditor has the right to obtain a transfer of property from an insolvent debtor at a fair price, for the sole purpose of securing or paying the debt.' "

These principles were applied and reaffirmed in the recent case of *Bell v. Thompson,* 122 S. C., 403; 115 S. E., 634:

"This action is based on fraud, and if the plaintiff is right, then Thompson never did intend to convey the Floyd tract. The plaintiff must rely on fraud. To set aside the deed to Mrs. Thompson for fraud, she must have participated in the fraud, and there is not the slightest evidence that she participated in the fraud, or knew of the fraudulent purpose. * * * Even if there was conclusive proof that M. B. Thompson knew it that is still not enough. In *Monaghan Co. v. Dickson,* 39 S. C., 149; 17 S. E., 698; 39 Am. St. Rep., 704, we find: 'In order to make out a case of actual fraud so as to set aside a mortgage, it is necessary to show concurrence in the fraudulent acts by the mortgagees as well as the mortgagors. * * *' "

And also in *Miller v. Erwin,* 129 S. C., 425, 426; 125 S. E., 39:

"The complaint in this case does not ask to set aside the conveyances under the Statute of this State to prevent an insolvent debtor from transferring his property with intent to prefer and favor a particular creditor or creditors, but is for the purpose of declaring the conveyances void for actual fraud, under the Statute known as the Statute of Elizabeth. Under the Statute of Elizabeth both parties must participate in the fraud. * * * The *mala fides* must exist in the minds of the grantor and grantee to constitute the conveyance as fraudulent. *Magovern v. Richard,* 27 S. C., 286; 3 S. E., 340; *McElwee v. Kennedy,* 56 S. C., 154; 34 S. E., 86; *Lenhardt v. Ponder,* 64 S. C., 364; 42 S. E., 169; *Bell v. Thompson,* 122 S. C., 400; 115 S. E., 633."

The same principles are laid down by the general authorities. Ruling Case Law says:

"Under this Statute, therefore, and under those modeled after it, the rule is practically universal that in order to render a sale for valuable consideration void as to creditors

it is not only necessary that the vendor should have entertained a fraudulent design, but it is also necessary that the vendee should have participated in it. * * *   12 R. C. L., 533.

Corpus Juris says:

"The transaction cannot be avoided as to him by other creditors unless it is shown that he shared in and participated in the fraudulent design of the vendor and received the property or secured it for other purposes than protecting himself from loss by reason of his demand against the vendor. * * *   The preferred creditor 'participates' in the fraudulent intent of the debtor where his purpose is not to secure the payment of his own debt, but to aid the debtor in defeating other creditors, in covering up his property, in giving him a secret interest therein, or in locking it up in any way for the debtor's own use and benefit. * * *" 27 C. J., 631, 632.

"In the case now before the Court there seems to be no doubt that Bollmann Brothers held a valid claim on Richard. They had a right to sue and obtain judgment, or they had a right to procure a mortgage or any other security. The law encourages vigilance, and we know of no legal obligation resting upon a creditor to notify the world that he intends to make, or is making, an effort to secure his debt. It is true, it might be high morality and distinguished abstract fairness and justice for a creditor to give up this right and refuse to take any security for his debt, unless all creditors are brought within the same protection; but the law does not require this, and such unselfish and disinterested benevolence and fairness has seldom been practiced." *Magovern v. Richard,* 27 S. C., 286; 3 S. E., 340. Cf. also *McElwee v. Kennedy,* 56 S. C., 154; 34 S. E., 86; Pomeroy, Eq. Jr., 418, 419.

Reasonable cause to believe transfer would operate to hinder creditors is not sufficient to constitute *mala fides.*

The South Carolina cases uniformly hold that even knowledge, and much less reasonable cause to believe, that the transfer would operate to hinder other creditors, is not sufficient and this position is supported by the overwhelming weight of the general authorities.

This particular question was fully discussed in *McElwee v. Kennedy,* 56 S. C., 154; 34 S. E., 86, in which a member of a partnership, while insolvent, had made a transfer of the larger part of his property to his wife in satisfaction of an antecedent debt. The Court held the transfer perfectly valid, even though the wife knew that the effect would be to delay other creditors, saying:

"To annul for fraud a deed based upon a valuable consideration, it must not only be shown that the grantor intended thereby to hinder, delay or defraud creditors, but it must also appear that the grantee participated in such fraudulent purpose. Even if we were to assume that there is evidence of *mala fides* in the grantor, yet if the sole purpose of the grantee was to secure her claims, having no intent to hinder, delay or defeat other creditors, her title cannot be affected by the *mala fides* of the grantor. The evidence fails utterly to show any intent on the part of the grantee to defraud her husband's creditors, and merely shows a purpose to secure her own *bona fide* claims.

"Conceding the insolvency of the firm of which the grantor was a member, it does not appear that the grantee was aware of it, and if she was aware of it, that would not show fraud in her, since a *bona fide* creditor has the right to obtain a transfer of property from an insolvent debtor at a fair price for the sole purpose of securing or paying a debt. * * * In view of this purpose, the fact that the transfers included practically all the individual property of the grantor, becomes of small importance (no question arising here under the Assignment Act), for the right to give and receive a

preference is not limited to any particular proportion of the debtor's property, but may extend to his whole property."

"We have been considering the case on the assumption of bad faith in the grantor, but we do not think the evidence warrants such a conclusion. We are convinced that the grantor intended only to satisfy the *bona fide* claims of his wife, and did not intend to hinder, delay or defraud his other creditors. A mere knowledge that the effect of the preference would be to hinder or delay other creditors, is not sufficient to taint the transaction, if there be no actual intent that the preference shall have such result." *McElwee v. Kennedy,* 56 S. C., 172; 34 S. E., 92.

This may now be taken as a leading case on this subject, but it merely affirms the doctrines uniformly applied in our cases both prior and subsequent (some of which have already been discussed, but are here cited to call attention to their bearing on this particular question).

In the most recent case on this question, *Miller v. Erwin,* 129 S. C., 425; 125 S. E., 36, the Court approved the doctrines as laid down in all the previous cases, citing:

*Magovern v. Richard,* 27 S. C., 286; 3 S. E., 342 (saying):

"What is *mala fides?* It must be an intent, not simply to assert one's own rights, but in addition thereto, to defeat the rights of another, participated in, as we have said, by both parties to the instrument.   *   *   *

"The mortgage may have that effect (to hinder other creditors), to the extent of the property mortgaged, but was this one of the intended effects?"

*McElwee v. Kennedy,* 56 S. C., 154; 34 S. E., 86 (holding):

"A mere knowledge that the effect of the preference would be to hinder or delay other creditors, is not sufficient to taint the transaction, if there be no actual intent that the preference shall have such result."

19—S. C. R.

*Lenhardt v. Ponder,* 64 S. C., 364; 42 S. E., 169, (in which the Court cited and relied upon the definitions hereinabove given).

*Bell v. Thompson,* 122 S. C., 403; 115 S. E., 634 (saying):

"This action is based on fraud * * * the plaintiff must rely on fraud. To set aside the deed to Mrs. Thompson for fraud, she must have participated in the fraud, and there is not the slightest evidence that she participated in the fraud, or knew of the fraudulent purpose. * * *"

Likewise in *Thorpe v. Thorpe,* 12 S. C., 154, the Court said (see page 167):

"Such measures as were pursued by J. G. Thorpe amount merely to a preference. It is entirely settled that such preference is lawful; and while, practically, it may hinder or delay some of the creditors, it does not hinder, delay or defraud creditors in the sense in which those words are used in the Statute. *Maples v. Maples,* Rice, Eq., 300. And while a preference to secure a valid debt may, under some circumstances, be impeached, one of the essential grounds is that the preferred creditor has conspired with the debtor at the expense of the other creditors. *Bird v. Aitken,* Rice. Eq., 73. We perceive no evidence of such fact in the preference now in question."

Also in the case of *Crosby v. Land Co.,* 96 S. C., 68, page 73, 79 S. E., 897, 899, the Court said:

"The purpose to defeat another is fraud. See *Lowry v. Pinson,* 2 Bailey, 324 [23 Am. Dec., 140], *Magovern v. Richards,* 27 S. C., 286, 287; 3 S. E., 340; *Gerald v. Gerald,* 28 S. C., 444; 6 S. E., 290. The purpose to protect yourself is not."

The same test is stated in the general authorities:

Corpus Juris says:

"*Knowledge and Intent of Parties.* An honest preference being valid, it follows that when there is an actual debt

or liability to be discharged or secured, the act of preference cannot be held fraudulent on the ground that it tends to hinder, delay, or defeat creditors, and that no inference of a fraudulent intent can be drawn from the purpose to give or obtain the preference. The fact that the transfer of property to the preferred creditor has the effect of diminishing the debtor's assets and may thus actually obstruct or defeat the claims of other creditors is not sufficient to impeach the transaction, for this is only the necessary effect of giving a preference, and this is true, although all the debtor's property is applied to the claim preferred, since if necessary to secure or discharge the debt, a debtor may devote his entire estate to that purpose and thus defeat the claims of all his other creditors." 27 C. J., 627, citing *Thorpe v. Thorpe,* 12 S. C., 154; *Maples v. Maples,* Rice, Eq., 300.

*"Knowledge that Other Creditors will be Defeated or Delayed.* The fact that both parties to a transfer of property to pay or secure a debt know that as a result thereof the claims of other creditors will be delayed or defeated does not constitute a fraud." 27 C. J., 629.

See, also, R. C. L., 536, 537.

Indeed, it is obvious that, if this were the test—cause to believe that a transfer would operate "to hinder creditors" —practically every transfer or mortgage by a debtor in financial trouble would be void under the Statute. This, it seems to us, amounts to a *reductio ad absurdum* of the plaintiff's case based upon the "second cause of action." See *Porter v. Stricker,* 44 S. C., at 192; 21 S. E., 635, *infra.*

AUTHORITIES CITED BY COURT DISTINGUISHED

There are some cases which in reference to voluntary transfers apply the doctrine adopted by the Court in this case; but so far as we have been able to discover, this doctrine is limited to voluntary transfers. In voluntary trans·fers, the doctrine of the intent being presumed from the

effect is applied, and such transfers held to be constructively fraudulent. This is conceded to be the law in South Carolina (*Jackson v. Lewis,* 34 S. C., 1; 12 S. E., 560; *Farr v. Sims,* Rich. Eq. Cas., 122; 24 Am. Dec., 396; *Betts v. Richardson,* 112 S. C., 279; 99 S. E., 815), and elsewhere, but where there is a consideration, as in the instant case, the doctrine is expressly rejected, and an active positive fraudulent intent is required. We have not found any case where the doctrine here advanced has been applied to transfers based on valuable consideration, and we presume there are none, since counsel did not cite any in the argument below, and the authorities cited by the Court ( *Freeman v. Pope,* 5 Ch. App., 538; 12 R. C. L., 537–539) only serve to illustrate the distinction above pointed out.

The case of *Freeman v. Pope* (decided in 1870), relied upon by plaintiff's counsel below, and quoted at length by the Court in its decree, was a case by plaintiff, a creditor, to set aside a voluntary settlement by debtor Rev. J. Constance to Julia Pope of $1,000 policy of insurance, and the decision was placed expressly upon the ground "that persons must be just before they are generous, and that debts must be paid before gifts are made"; the result of the "voluntary assignment of the policy" being "that he had literally nothing· wherewith to pay" his debts. "The case is therefore one of those where an intention to delay creditors is to be assumed from the act."

In the concurring opinion of Sir G. M. Giffard, J., the point of the decision and the distinction are clearly emphasized:

"Of course, the irresistible conclusion from that case that the voluntary settlement was intended to defeat the subsequent creditors. * * * There is one class of cases, no doubt, in which an actual and express intent is necessary to be proved—that is in such cases as *Holmes v. Penny,* 3 K. & J., 90, and *Lloyd v. Attwood,* 3 DeG. & J., 614, where the

instruments sought to be set aside were founded on valuable consideration; but, where the settlement is voluntary, then the intent may be inferred in a variety of ways."

This distinction is likewise made in the passage from Ruling Case Law cited by the Court:

"It is well to bear in mind, however, that under such circumstances, the invalidity of the conveyance arises purely from the presumed intent with which it was executed, although such intent is determined by the attending circumstances, rather than from the actual intention of the parties." 12 R. C. L., 539.

And in the South Carolina cases referred to in this Section of R. C. L. (*Miller v. Tollison*, Harp. Eq. [S. C.], 145; 14 Am. Dec., 712; *Niolon v. Douglas*, 2 Hill, Eq. [S. C.], 443; 30 Am. Dec., 368; *Gadsden v. Carson*, 9 Rich. Eq., [S. C.], 252; 70 Am. Dec., 207; *Farr v. Sims*, Rich. Eq. Cas. [S. C.], 122; 24 Am. Dec., 396), the distinction as applied to the South Carolina cases is particularly emphasized:

In *Miller v. Tollison, supra,* a deed from one Tollison to one Holder was set aside specifically on the ground of conspiracy to defraud:

"* * * Because the deed, making an absolute conveyance of the land by Tollison, for a large nominal price, was intended as a fraud, to cover his property from his creditors, and as Holder lent his name to this fraud, he ought not to derive any benefit from it." Harp., Eq. (S. C.), 145; 14 Am. Dec., 712.

In *Niolon v. Douglas, supra,* in which an assignment giving preferences was sustained in the absence of real fraud, the Court said:

"The plain truth seems to be, that it is impracticable as to the mass of men, to put all creditors on a perfect equality; and if it was practicable, injustice would often follow [10 Mod., 459]. Undoubtedly the power to prefer may be per-

verted and abused, even when the abuse discloses no fraud upon which a Court can seize; but 'the power, as it may be abused, so, on the other hand, may be very properly exercised.' The discretion must be left to the debtor, within the limits of fraud." 2 Hill. Eq. (S. C.), 443, page 451; 30 Am. Dec., 368.

In *Gadsden v. Carson, supra,* in which it was held a debtor could not exact a full release from all debts in an assignment of only a portion of his property, but the right to prefer in the absence of fraud was recognized, the Court used the language hereinabove quoted.

*Farr v. Sims,* Rich. Eq. Cas. (S. C.), 122; 24 Am. Dec., 396, was a case of a voluntary gift of slaves from father to son, where the father apparently retained possession of the slaves, and the gift was avoided specifically on the ground that it was voluntary and unrecorded.

Also the case of *Mann v. Poole,* 40 S. C., 1; 18 S. E., 145, 889, cited by the Court, illustrates the same distinction, the decision being based specifically upon the existence in fact of an actual intention to prefer; the debtor being "consciously insolvent," and having "systematically contrived" to prefer his wife and grandchildren, as part of a "design" to defeat an "assignment." Moreover, it is important to note that the construction which the Court has here placed upon that case was sought to be given to it by counsel for the respondent in the subsequent case of *Porter v. Stricker,* 44 S. C., 189; 21 S. E., 635—that intent to prefer one creditor or to defraud another, may be inferred from knowledge of the effect—but such construction was emphatically rejected in the opinion of Mr. Justice McIver:

"The case of *Mann v. Poole,* 18 S. E., 145, reported, also, in 40 S. C., p. 1, comes next in order. That case seems to be relied on by counsel for respondents, as shaking, or at least qualifying, the doctrine uniformly recognized in the series of cases above cited, by laying down as the true test

in all such cases as the present, the result of an inquiry whether it was the intention of the insolvent debtor, in giving the mortgage assailed, honestly to secure one or more of his creditors, ⬛ ,was it his purpose thereby to give one or more of his creditors a preference over other creditors." 44 S. C., 191; 21 S. E., 639.

And then, after quoting from Mr. Justice Pope's decision in that case, saying:

"Thus the intention of the insolvent debtor must be ascertained, and this presents a question of fact."

Continued: .

"Now, when it is remembered that whenever an insolvent debtor gives to one of his creditors a mortgage upon the whole, or even a part of his property, he necessarily gives such creditor a preference over his unsecured creditors; and as a man is always presumed to intend the necessary consequence of any act which he may do, it is very obvious that the question of fact mentioned in the foregoing quotation never could arise, if the language there found should be construed as counsel for respondent claim it should be; for as soon as it appeared that the insolvent debtor had made a mortgage to one of his creditors, it would at the same time appear that he had preferred one of his creditors; and hence, the question of fact, whether he had made the mortgage with intent to prefer a given creditor, never could arise.   * * *" Page 192 (21 S. E., 639).

The appellants did nothing except to secure a just debt due them. They did not conspire with the bank to defraud any other creditor; did not participate in any fictitious debt that was not due them; and should not under the evidence in this case be branded as violating the Statute of Elizabeth and be stigmatized as acting in *mala fides* to defraud, hinder, and delay other creditors of the bank. The appellants were apprehensive from the rumors afloat, and, so far as being guilty of fraud to defraud, hinder, and delay other creditors of the

bank, attempted to protect the funds held by them as trustee, the action on the part of the appellants was commendable.

They got possession of the securities without a formal assignment which was sufficient to carry title. They could have drawn their deposits, and would have done so, no doubt, but for the assurance that the bank was solvent, by the officers of the bank. This is the best evidence, to my mind, that the appellants did not know that the bank was insolvent, and violated none of the provisions of the Statute commonly known as the Statute of Elizabeth and the Assignment Acts.

In *Magovern v. Richard,* 27 S. C., 284; 3 S. E., 341, the Court said:

"Now, applying our remarks to the first above-named case we are compelled to say that we do not find in the testimony anything more than an ordinary mortgage executed by a debtor—insolvent, no doubt, at the time—covering a large portion of his property in favor of one creditor over other creditors; this done in the exercise of a right which has been recognized almost time out of mind in this State and elsewhere in numerous cases still standing unoverruled, and which, until they are overruled, are authority upon this Court. See numerous cases in our own reports. The recent cases of *Wilks v. Walker* [22 S. C., 108], and *Austin, Nichols & Co. v. Morris* [23 S. C., 393], have not touched this principle. Nor did the Assignment Act intend to touch it; or, if such was the intention, it does not appear in the language used in said act."

In *Marion, Rec'r, v. Weston et al.,* 126 S. C., 65; 119 S. E., 582, the Court quotes with approval from *Porter v. Stricker,* 44 S. C., 190; 21 S. E., 635, which has always been a leading case on this subject in South Carolina, and which was relied upon in the last case of *Allgood v. Allgood,* 134 S. C., 233; 132 S. E., 48, and lays down the following as a basic proposition:

"From this review of the cases upon the subject in this State, the following propositions, applicable to the case under consideration, are clearly deducible:   (1) That an insolvent debtor may, by a *bona fide* mortgage, which is intended merely as a security for a just debt, prefer one of his creditors.   *  *  *"   Page 88 (119 S. E., 589).

Likewise, the rule prevailing at common law in this State prior to the passing of the Assignment Act was thus stated in *Niolon v. Douglas,* 2 Hill Eq., 443; 30 Am. Dec., 368:

"Whatever doubts may have been entertained or expressed, respecting the morality or the policy of permitting a failing debtor to prefer some of his creditors over others, his legal right to do so is too well settled to admit of discussion." Page 341 (30 Am. Dec., 368).

Also in *Gadsden v. Carson,* 9 Rich. Eq., 257; 70 Am. Dec., 207:

"*  *  *   But the plaintiff contends further, that the deed itself should be set aside, and vacated *in toto,* as fraudulent, null, and void, upon the various grounds taken in the bill. Surely no one can doubt that a debtor, in paying his debts, may prefer one creditor to another.   The right to do so results necessarily from the absolute dominion which the proprietor has over his estate."

We think that the preference of the city and treasurer deposits is not prohibited by any of the Statutes, and is perfectly valid, and his Honor was in error, and misconstrued the Statutes under the facts of the case.

We do not think that the debtor has to make a general assignment for the benefit of his creditors in order to secure a debt due to the public.   The intent of the Legislature was evidently intended to secure as a preference any debt due the public, and a debtor could prefer any debt due the public without making a general assignment.   The deposit by the city and treasurer was a debt due the public.   *Baxter v.*

*Baxter,* 23 S. C., 114; *Lockwood v. Lockwood,* 68 S. C., 328; 47 S. E., 441.

It follows inevitably from a proper consideration of the two Sections of the Act in connection with the above-stated principles that preferences which are not prohibited under Section 5511 cannot be avoided under Section 5512 of the Act. The two Sections are part of one Act, were passed at the same time (1882), and must be construed together. Section 5512 was obviously passed as a companion measure to Section 5511, and intended merely to prevent a debtor from doing by piecemeal what he was prohibited from doing by Section 5511, and clearly should not be construed as prohibiting any preferences which were exempted and permitted under Section 5511.

This construction is apparent from the terms of the Act itself:

*"All Transactions Within Ninety Days of Insolvency Void.*—If any person, being insolvent, within 90 days before the making of any assignment by him or her of his or her property for the benefit of his or her creditors, with a view of giving a preference to any creditor or person having a claim against him or her, or who is under any liability for him or her, procures or suffers any part of his or her property to be attached, sequestered, or seized on execution, or makes any payment, pledge, assignment, transfer, or conveyance of any part of his or her property, either directly or indirectly, absolutely or conditionally, the person receiving such payment, pledge, assignment, transfer, or conveyance of any part of his or her property, or to be benefited thereby, or by such attachment, having reasonable cause to believe such person to be insolvent, and that such attachment, sequestration, seizure, payment, pledge, assignment or conveyance is made in fraud of the provisions of this chapter, the same shall be void, and the assignee may recover the property, or the value of it, from the person so receiving it,

or so to be benefited. Nothing, however, in this Section shall be construed to invalidate any loan of actual value, or the security therefor, made in good faith, upon a security taken in good faith, on the occasion of the making of such loan, or any security *bona fide* made for advances." 3 Civil Code of S. C., § 5512, pp. 1677, 1678.

Such pledges or payments are here avoided only if made "within 90 days before the making of any assignment * * * with a view of giving a preference * * * in fraud of the provisions of this chapter." Section 5511 of the Act, which is the only provision of the chapter (82) containing any prohibition against preferences, is thus clearly made the dominant Section, and Section 5512 intended to be subsidiary.

In *Lenhardt v. Ponder,* 64 S. C., 363; 42 S. E., 172, the Court, in speaking of the necessity of there being an intention to give an unlawful preference to avoid a pledge under Section 5512, said:

"It will also be observed that Section 2147 is not, in express terms, made applicable to cases in which the debtor did not make a formal assignment for the benefit of creditors within ninety days after the execution of the deed or other instrument intended to give the preference prohibited by that Section.

"The necessity for the party attacking the deed to show (1) that the grantor was insolvent at the time of the conveyance, and (2) that the conveyance was made with a view to give an unlawful preference, arises whether the case comes within the provisions of Section 2146 or Section 2147, by the terms of said Sections. While it is true that the requirements that the party attacking the deed must show (3) that the grantee had reasonable cause to believe that the grantor was insolvent at the time of the conveyance, and (4) that the grantee had reasonable cause to believe that the conveyance was made in fraud of the assignment law, are not appli-

cable in the absence of a formal assignment within ninety days after such deed, these requirements are, however, but the declaration of salutary rules which equity and good conscience demand should be enforced, whether the case arises under Section 2146 or Section 2147,  *  *  *"

—the Section 2147 mentioned in this quotation being now Section 5512.

We do not think, in addition to this, that under all the facst and circumstances the City of Columbia and the treasurer of Richland County had reasonable cause to believe the bank insolvent, or intended to give unlawful preference at the time they took the securities. The bank was not insolvent at the time the pledges were taken, but became so after rumors floated around and run was made.

In view of the number of bank failures in the last two years in this State, and especially in Columbia, a breath that a bank was shaky was enough to start a run. The officers of the bank did everything in their power to keep the bank out of the hands of a receiver, and did not themselves know they were insolvent when the transaction took place with the appellants.

We are of the opinion that the exceptions should be sustained and decree reversed.

Mr. Justice Carter concurs.